UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOSE CLAUDIO; WILLIE GOSIER; IZAYAH
JOHNSON; MARIO LESLIE; AJAREL PATTERSON;
DAVID ROBERTS; and GAMEIN WRIGHT,

                                    Plaintiffs,

                    -against-

COUNTY OF ONEIDA; COUNTY OF ALBANY;
ROBERT MACIOL, SHERIFF OF ONEIDA COUNTY;
MARK KINDERMAN, ONEIDA COUNTY CHIEF OF
CORRECTIONS; CRAIG D. APPLE, SR., SHERIFF OF
ALBANY      COUNTY;      SERGEANT      JAMES
PATERNOSTER; CAPTAIN CLAYTON SMITH;
SERGEANT "B." CHAPMAN; OFFICER SCOTT
HOLBERT;    OFFICER    MICHAEL    SPIELMANN;
OFFICER MERZUK HOZANOVIC; OFFICER JENNA
PEASE; OFFICER HUNTER CORCORAN; OFFICER
JEFFREY JONES; JOHN DOE ONEIDA COUNTY
SERT OFFICERS #1–20; LIEUTENANT ANTHONY
TORRISI;    LIEUTENANT    MARK    VALVO;
LIEUTENANT    RYAN    LAWSON;    LIEUTENANT
ANTHONY COPPOLO; SERGEANT MICHAEL
BONACCI;    SERGEANT    JOSEPH    KELLY    JR.;
OFFICER JOSIAH HALEY; OFFICER THUAN TON;
OFFICER    BRANDON    LEGAULT;    OFFICER
THOMAS PLEAT; OFFICER CRAIG GIBBONS;
OFFICER LEON POULIN; OFFICER JARRED
JAROSZ; OFFICER A. WRIGHT; OFFICER STEVEN
ALMINDO; OFFICER RYAN BARTLETT; OFFICER
VINCENT LIVRERI; OFFICER SAMER MOHAMED
ALI; OFFICER JEFF HART; and ALBANY COUNTY
OFFICERS A, B, G, S, and T,

                                    Defendants.

CASE NO.:      9:25-cv-1615   AMN/MJK

**COMPLAINT**

**TRIAL BY JURY DEMANDED**

      **PLEASE TAKE NOTICE** that Plaintiffs JOSE CLAUDIO, WILLIE GOSIER, IZAYAH

JOHNSON, MARIO LESLIE, AJAREL PATTERSON, DAVID ROBERTS, and GAMEIN

WRIGHT, by and through their attorneys, Roth & Roth LLP, and Kaufman Lieb Lebowitz & Frick LLP, for their Complaint allege as follows:

## I.  PRELIMINARY STATEMENT

1.      This is a civil rights action seeking redress for a coordinated, racially targeted, jail-wide raid perpetrated on August 20, 2024, inside the Oneida County Correctional Facility ("OCCF"). Joint emergency response teams from the Oneida County Sheriff's Office (Sheriff's Emergency Response Team, or "SERT") and the Albany County (Correctional Emergency Response Team, or "CERT") carried out a planned operation that battered Plaintiffs and scores of other incarcerated individuals—overwhelmingly Black or Latino—who were already restrained, compliant, and handcuffed.

2.      Plaintiffs, who were at the time housed in Oneida County Jail, bring this civil rights action under 42 U.S.C. §§ 1983, 1985(3), and 1986, as well as the Eighth and Fourteenth Amendments to the United States Constitution, and related state law claims, to redress a pattern of racialized violence, medical neglect, deliberate indifference, retaliation, and systemic misconduct.

3.      All Plaintiffs in this action are Black or Latino men who were incarcerated at OCCF on August 20, 2024. On that date, they were each violently assaulted during a pre-planned and coordinated raid carried out by officers from the Albany County CERT and Oneida County SERT. Despite being compliant or injured, the Plaintiffs were brutally beaten—including being repeatedly punched, kicked, stomped, and thrown to the floor—resulting in serious physical injuries such as fractures, deep lacerations, nerve damage, loss of consciousness, and permanent blurred vision, all while being threatened and mocked by officers. Following the attacks, their immediate and polite requests for medical attention were repeatedly ignored or significantly delayed, exacerbating their

injuries and leading to injuries that included chronic pain, hearing loss, and severe post-traumatic stress.

4.     Numerous other Black and Latino incarcerated individuals were similarly attacked, while white incarcerated individuals in the same units were spared. Despite the severity of the incident, no disciplinary reports, misbehavior tickets, or segregation sanctions were issued to Plaintiffs or any other assaulted detainees, suggesting institutional knowledge that the violence was unjustified and unlawful.

5.     Defendant Sgt. Paternoster, through his body-worn camera, is seen deliberately backing away from the scene and later lied by stating "I wasn't even there." Plaintiffs' repeated, polite requests for aid were ignored, contributing to long-term neurological, physical, and emotional harm. After the assault, Plaintiffs remained largely locked down, suffering from panic attacks, paranoia, anxiety, and worsening post-traumatic stress disorder. Oneida officers threatened Plaintiffs and other detainees with additional violence if they complained.

6.     This complaint seeks to expose and redress not only the excessive force, but the systemic conditions that allowed it: *Monell* liability for unconstitutional customs, deliberate indifference by medical staff, suppression of First Amendment grievance rights, racial discrimination, and a conspiracy of silence among officers and supervisors who either orchestrated or failed to prevent these violations of law.

7.     The raid was devised, authorized, and supervised by Defendant Kinderman, the Oneida County Chief of Corrections, who conspired with Defendant Craig D. Apple, Sr., the Albany County Sheriff, to invite and unleash the Albany CERT on Oneida's jail and then ratify their misconduct. Kinderman and Apple praised and protected the officers after the raid, despite

the documented serious injuries they caused to Plaintiffs and other incarcerated individuals, who later filed numerous excessive force complaints.

8.     Following the raid, the Oneida County Sheriff's Office posted a photo on Facebook thanking Defendant Apple and the Albany County CERT:



9.     In the aftermath of the raid, policymaking officials and officers from both counties engaged in a systemic cover-up: required use-of-force reports were suppressed or falsified, incarcerated individuals were threatened ("*We'll bring Albany back on you*") to deter complaints, bogus disciplinary tickets were issued to discredit victims, and policymakers lied to state investigators to whitewash the incident. Such actions were taken in furtherance of a conspiracy to deprive the predominantly Black and brown incarcerated individuals of their civil rights and to obstruct justice.

## II.    JURISDICTION AND VENUE

10.    **Jurisdiction:** This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4), as Plaintiffs' claims arise under the U.S. Constitution and federal law (42 U.S.C. §§ 1983, 1985, and 1986). The Court has supplemental jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. § 1367.

11.    **Venue:** Venue is proper in the Northern District of New York under 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in Oneida County, New York – which lies within this District – and because all defendants, on information and belief, reside in New York State.

## III.    JURY DEMAND

12.    All Plaintiffs demand trial by jury.

## IV.    PARTIES

13.    **Plaintiff Jose Claudio** is a Latino man and resident of New York State. At the time of the incident, he was a pretrial detainee in Pod 8 at OCCF in Oneida County, New York. Mr. Claudio is currently incarcerated at Mohawk Correctional Facility.

14.    **Plaintiff Willie Gosier** is a Black man and resident of New York State. At the time of the incident, he was a pretrial detainee in Pod 8 at OCCF in Oneida County, New York. Mr. Gosier is currently incarcerated at Upstate Correctional Facility.

15.    **Plaintiff Izayah Johnson** is a Black man and resident of New York State. At the time of the incident, he was a pretrial detainee in Pod 8 at OCCF in Oneida County, New York. Mr. Johnson is currently incarcerated at Five Points Correctional Facility.

16.     **Plaintiff Mario Leslie** is a Black man and resident of New York State. At the time of the incident, he was a pretrial detainee in OCCF's Pod 8 in Oneida County, New York. Mr. Leslie is currently incarcerated at the United States Penitentiary, Canaan.

17.     **Plaintiff David Roberts** is a Black man and resident of New York State. At the time of the incident, he was housed in OCCF's Pod 8 on a contempt conviction and had no serious disciplinary issues. On August 20, 2024, he had a bad knee, but no other significant medical conditions. Mr. Roberts is now at liberty.

18.     **Plaintiff Gamein Wright** is a Black man and resident of New York State. At the time of the incident, he was housed in OCCF's Pod 4 (protective custody) for a probation violation. He had limited mobility in his left hand from a prior shooting and suffers from PTSD. On August 20, 2024, he was recovering from prior surgeries and had not requested mental-health services. Mr. Wright is now at liberty.

19.     **Plaintiff Ajarel Patterson** is a Black man and resident of New York State. At the time of the incident, he was housed in OCCF's Pod 8 on a contempt conviction. Mr. Patterson had no prior jail experience. He is now at liberty.

20.     **Defendant County of Oneida** is a municipal corporation organized under New York law. Oneida County operates and is responsible for the OCCF jail and the Oneida County Sheriff's Office ("OCSO"). The County (through the OCSO and policymakers like Defendants Kinderman and Sheriff Robert Maciol) oversees the training, supervision, and conduct of jail staff and of the SERT. At all relevant times, Oneida County, via its officials, established the policies and customs under which the OCCF was operated and had ultimate responsibility for protecting incarcerated individuals' rights and safety.

21.     **Defendant County of Albany** is a municipal corporation organized under New York law. Albany County, through the Albany County Sheriff's Office ("ACSO") and its final policymakers (including Defendant Sheriff Craig D. Apple, Sr.), maintains a CERT unit. On information and belief, Albany County – via Defendant Apple – authorized and deployed its CERT deputies to OCCF on August 20, 2024, as part of a joint operation. Albany County had a duty to ensure its officers obeyed the law even when operating in another county's facility, and it was responsible for the training, supervision, and discipline of the ACSO CERT members who participated in the raid.

22.     **Defendant Robert M. Maciol** was, at all relevant times, the Sheriff for Oneida County. He is sued in his individual and official capacities. He oversaw investigations pertaining to the incident on August 20, 2024, approved and authorized Kinderman's decision to use an out-of-jurisdiction Sheriff's department—the Albany CERT—in a jail-wide sweep search and approved and authorized the Albany CERT to not wear body cameras and to not use K-9s— essential evidence-gathering items for searches and investigations. Following the incident, Maciol ratified and approved the conduct of the Oneida officers and Albany CERT and was photographed after the raid with the officers who conducted the raid—smiling and satisfied—along with Defendants Kinderman, Paternoster, and Smith. He reviewed, approved, and ratified Kinderman's official response to the Attorney General's inquiry, which contained blatantly false and misleading information in an attempt to circumvent investigations and avoid being held accountable for unconstitutional and egregious acts committed on August 20, 2024.

23.     **Defendant Mark Kinderman** was, at all relevant times, the Chief Deputy of Corrections for the OCSO (Oneida County). He is sued in his individual and official capacities. As Chief of Corrections, Kinderman was a final policymaker for Oneida County in matters of jail

management and supervision of incarcerated individuals. Upon information and belief, he planned and directed the August 20, 2024, raid at OCCF, was present on-site during the operation, and personally observed and oversaw aspects of the raid and its aftermath. Kinderman ratified the excessive force by praising the officers afterward and misrepresented the incident in communications with oversight authorities, while failing to discipline or retrain the officers involved.

24.     **Defendant Craig D. Apple, Sr.** was, at all relevant times, the Sheriff of Albany County. He is sued in his individual and official capacities. Apple was the final policymaker for the ACSO and its CERT. He personally approved and authorized the deployment of Albany County's CERT to Oneida County's jail on August 20, 2024, and was responsible for supervising his deputies' conduct during that operation. Apple was made aware of the uses of force during and after the raid and failed to take appropriate remedial action; instead, his office resisted and delayed disclosure of records concerning the raid. His actions and omissions demonstrated deliberate indifference to the constitutional violations committed by his subordinates.

25.     **Defendant Sergeant James Paternoster** was a Corrections Sergeant with the OCSO SERT. He is sued in his individual capacity (and official capacity to the extent applicable) and, on information and belief, was acting under color of state law. Paternoster took part in the raid and wore an active body-worn camera during at least part of the operation. During the assaults on some of the detainees, Paternoster was present and instead of intervening he stepped back and turned his camera away to avoid capturing the worst of the violence. When asked about the incident, he falsely claimed to have "no idea" what had happened.

26.     **Defendant Captain Clayton Smith** was an OCSO Captain who, on information and belief, authorized the Oneida SERT activation on August 20, 2024, and coordinated with

Albany's team. He is sued in his individual capacity (and official capacity to the extent applicable) and, on information and belief, was acting under color of state law. Smith was present in Pod 4 during the assaults and knew pepper spray had been used; he approved the force that was employed and failed to intervene to stop or prevent the unlawful use of force. He made no corrective actions with respect to the assaults, or the officers involved and participated in the cover-up of the incident with Kinderman and Maciol.

27.     **Sergeant "B." Chapman** was an Oneida SERT Sergeant who helped muster the Oneida team for the raid and participated in searching pods. He is sued in his individual capacity (and official capacity to the extent applicable) and, on information and belief, was acting under color of state law. Chapman's body-worn camera recorded portions of the operation.

28.     **Defendant Officer Scott Holbert** was a corrections officer with OCSO. In Pod 4, Officer Holbert saw that many of the detainees were handcuffed at the start of the raid. He is sued in his individual capacity (and official capacity to the extent applicable) and, on information and belief, was acting under color of state law. Officer Holbert saw the aftermath of the assault on Mr. Wright (and other detainees), and despite having had the time and opportunity, Holbert failed to intervene to prevent, report, or stop the unlawful assaults. Further, upon information and belief, Holbert handed an Albany deputy a canister of Oleoresin Capsicum ("OC") spray, also known as pepper spray, to use on detainees and facilitated the assaults by unlocking and opening their cell doors upon the request of the Albany CERT.

29.     **Defendant Officer Hunter Corcoran** was a corrections officer with OCSO who was present in Pod 8 and assisted during the operation. He is sued in his individual capacity (and official capacity to the extent applicable) and, on information and belief, was acting under color of state law.

30.    **Defendant Officer Michael Spielmann** was a corrections officer with OCSO who was present in Pod 4 and assisted in the operation. He is sued in his individual capacity (and official capacity to the extent applicable) and, on information and belief, was acting under color of state law.

31.    **Defendant Officer Merzuk Hozanovic** was a corrections officer with OCSO. On August 20, 2024, he was present during the raid on Pod 4. He is sued in his individual capacity (and official capacity to the extent applicable) and, on information and belief, was acting under color of state law.

32.    **Defendant Officer Jenna Pease** was a corrections officer with OCSO. On August 20, 2024, she was present during the raid on Pod 4. She is sued in her individual capacity (and official capacity to the extent applicable) and, on information and belief, was acting under color of state law.

33.    **Defendant Officer Jeffrey Jones** was a corrections officer with OCSO. On August 20, 2024, he was present during the raid on Pod 8. He is sued in his individual capacity (and official capacity to the extent applicable) and, on information and belief, was acting under color of state law.

34.    **Defendants John Doe Oneida County SERT Officers #1–20** were direct participants and/or on-site supervisors in the August 20, 2024, raid. Each is sued in his individual capacity (and official capacity to the extent applicable), and, on information and belief, was acting under color of state law.

35.    **Defendant Lieutenant Anthony Torrisi**, on information and belief, was the Albany County CERT commander on site. He led the Albany team's tactical entry into the housing

units and directly oversaw Albany deputies as they used force on incarcerated individuals. On information and belief, Lt. Torrisi was one of the officers who initiated force on detainees.

36.    **Defendant Albany County Officer A** was a direct participant and/or on-site supervisor in the raid. He is sued in his individual capacity (and official capacity to the extent applicable) and, on information and belief, was acting under color of state law. Mr. Roberts identified Albany County Officer A as the shorter officer of Asian descent wearing a green uniform and black hat, with the yellow "SHERIFF" letters visible across his vest. Mr. Patterson also recalls an Albany County officer of Asian descent as one of the officers who entered his cell and assaulted him. Defendant Officer A is standing on the far-right side of the picture from paragraph 10 and is also pictured below in a close-up photograph extracted from the one in paragraph 10. Upon information and belief, Defendant Officer A was one of the officers who entered Plaintiff Roberts's and Plaintiff Patterson's cells and assaulted them.



37.    **Defendant Albany County Officer B** was a direct participant and/or on-site supervisor in the raid. He is sued in his individual capacity (and official capacity to the extent

applicable) and, on information and belief, was acting under color of state law. Mr. Roberts identified Albany County Officer B as the bald officer in the green uniform positioned in the middle of the front row of officers in the photograph shown in paragraph 10. He is also pictured below in a photo extracted from the one in paragraph 10. Upon information and belief, Defendant Officer B was one of the primary officers initiating the use of force on incarcerated individuals and was one of the officers who assaulted Mr. Roberts.



38.    **Defendant Albany County Officer G** was a direct participant and/or on-site supervisor in the raid. He is sued in his individual capacity (and official capacity to the extent applicable) and, on information and belief, was acting under color of state law. Mr. Wright identified him as the Caucasian officer with glasses, no hat, and positioned on the far-right side of the second row in the picture from paragraph 10. Defendant Officer G is also shown below in a

close-up photograph extracted from the one in paragraph 10. Upon information and belief, Defendant Officer G was one of the officers initiating the use of force on incarcerated individuals and was one of the officers who assaulted Mr. Wright.



39.    **Defendant Albany County Officer S** was a direct participant and/or on-site supervisor in the raid. He is sued in his individual capacity (and official capacity to the extent applicable) and, on information and belief, was acting under color of state law. Mr. Patterson identified him as the tall officer, in green uniform, wearing a backwards hat to the far right in the picture from paragraph 10. Defendant Officer S is also show below in a close-up photograph extracted from the original picture in paragraph 10. Upon information and belief, Defendant Officer S was one of the officers who was shouting at compliant incarcerated individuals: "Who has something to say?!" Upon information and belief, Defendant Officer S was spearheading the assaults on incarcerated individuals and was one of the officers who assaulted Mr. Patterson.



40. **Defendant Albany County Officer T** was a direct participant and/or on-site supervisor in the raid. He is sued in his individual capacity (and official capacity to the extent applicable) and, on information and belief, was acting under color of state law. Mr. Wright identified him as the tall officer wearing a hat next to Officer G in the picture from paragraph 10. Defendant Officer T is also show below in a close-up photograph extracted from the original picture in paragraph 10. Upon information and belief, Defendant Officer T was one of the officers who assaulted Mr. Wright.



41. **Defendants John Doe Oneida County SERT Officers #1–20** were direct participants and/or on-site supervisors in the August 20, 2024, raid. Each is sued in his individual

capacity (and official capacity to the extent applicable), and, on information and belief, was acting under color of state law.

42.    **Defendants Lieutenant Mark Valvo; Lieutenant Ryan Lawson; Lieutenant Anthony Coppolo; Sergeant Michael Bonacci; Sergeant Joseph Kelly, Jr.; Officer Josiah Haley; Officer Thuan Ton; Officer Brandon Legault; Officer Thomas Pleat; Officer Craig Gibbons; Officer Leon Poulin; Officer Jarred Jarosz; Officer A. Wright; Officer Steven Almindo; Officer Ryan Barlett; Officer Vincent Livreri; Officer Samer Mohamed Ali; and Officer Jeffrey Hart** were all active members of Albany's 2024 CERT Team and were present, on-site, and participating during the raid. Each is sued in his individual capacity (and official capacity to the extent applicable) and, on information and belief, was acting under color of state law. Some or all of the above named officers are pictured below in green uniform.



## V.    CONDITIONS PRECEDENT

43.    Plaintiffs timely served Notices of Claim on Oneida and Albany Counties and testified at hearings pursuant to General Municipal Law § 50-h on February 12, 2025 (Plaintiff Claudio), February 13, 2025 (Plaintiffs Johnson, Leslie, and Patterson) and April 9, 2025 (Plaintiffs Gosier, Roberts, and Wright). Over 30 days have elapsed since service of the Notices, and Defendants have not adjusted or settled the claims. All other conditions precedent have been satisfied or waived.

44.    The exhaustion requirements of the Prison Litigation Reform Act do not apply at all—or at minimum not to Plaintiffs Patterson, Roberts, or Wright—because Plaintiffs Patterson, Roberts, and Wright are not currently confined in any jail, prison, or other correctional facility.

45.    Plaintiff Claudio submitted a grievance concerning the assault and his resulting injuries on August 23, 2024 (Grievance #24-135). On September 3, 2024, the grievance was accepted in part and denied in part under the reasoning that, "as per Chief Kinderman, administration are investigating such claims and any use of force will be reviewed by the use of force board." Mr. Claudio appealed the decision to the Chief Administrative Officer ("CAO") the same day. The CAO accepted the grievance in part and denied it in part based on the fact that the use of force committee was investigating the allegations, but misdated the decision as "10/9," rather than the correct date of "9/10." Mr. Claudio appealed the CAO's denial on September 11, 2024, the day after the CAO's decision, and Lieutenant James D'Amico submitted the grievance and appeal to the Citizen's Police and Complaint Review Council ("CPCRC") on September 19, 2024. On November 13, 2024, the CPCRC denied the appeal based on the timing of the Grievance Coordinator's decision and submission of the appeal, the lack of appropriate remedies directed by the CAO, and OCCF's failure to investigate the allegations.

46.     Plaintiff Gosier repeatedly requested a formal grievance form in informal complaint forms but was not given it for weeks. Once he was finally given a form, he promptly submitted a grievance concerning the raid and subsequent denial of medical and mental health care on September 6, 2024 (Grievance #24-150), in which he noted his prior submission of complaints and efforts to obtain a grievance form. Mr. Gosier's grievance was accepted in part and denied in part on September 19, 2024, under the reasoning that, "as per Chief Kinderman, administration are investigating such claims and any use of force will be reviewed by the use of force board." On October 3, 2024, the CAO denied the grievance because it was submitted beyond five days of the act. Mr. Gosier appealed the CAO's denial on October 14, 2024, and that appeal was denied by the CPCRC on December 11, 2024.

47.     Plaintiff Johnson submitted a grievance concerning the raid and insufficient medical care on August 24, 2024 (Grievance #24-140). The grievance was not signed by the receiving staff at OCCF, though it was stamped "Received." Mr. Johnson's grievance was accepted in part and denied in part on August 27, 2024, under the reasoning that, "as per Chief Kinderman, administration are investigating such claims and any use of force will be reviewed by the use of force board." The same day, Mr. Johnson appealed the decision. On August 31, 2024, the CAO issued a decision accepting in part the grievance, to the extent that all accusations "are being investigated," and denying in part as to "any verification of what the grievant has claimed." Mr. Johnson appealed the denial on September 3, 2024, and Lt. D'Amico submitted the appeal to the CPCRC the next day. On November 13, 2024, the CPCRC denied Mr. Johnson's appeal because of administrative issues at OCCF—namely, the "staff who received the grievance failed to sign and date the grievance form" and "the Grievance Coordinator failed to provide an accurate date" of submission to the CPCRC.

48.     Plaintiff Leslie submitted a grievance concerning the raid and his injuries on August 26, 2024, after spending approximately five days in the infirmary (Grievance # 24-144). During his time in the infirmary, Mr. Leslie repeatedly asked for a grievance form but did not receive one until August 26, 2024, the day he submitted his grievance. Lt. D'Amico marked the grievance "unable to process" on August 29, 2024, given that Mr. Leslie had already been released to federal custody at that point.

## VI.     FACTUAL ALLEGATIONS

### A.  Allegations Common to All Causes of Action and All Plaintiffs

#### 1.  Planning and Launch of the Joint Raid

49.     On or about August 18, 2024, Defendant Kinderman (Oneida's Chief of Corrections) contacted Defendant Apple (Albany's Sheriff) to request assistance with a "full facility sweep" of OCCF. Kinderman sought to bring in Albany County's CERT – a specialized tactical team – to supplement Oneida's own SERT unit for a coordinated raid. The operation was ostensibly to search for contraband and assert control in the jail. High-level approval was secured, and Albany County agreed to participate.

50.     Upon information and belief, prior to the sweep, Kinderman and Apple, along with other policymaking officials from Oneida and Albany counties, conspired to coordinate and plan execution of the sweep, including the use of excessive force against a largely Black and brown population of incarcerated individuals. These policymakers knew or should have known that the planned sweep would violate the constitutional rights of all incarcerated individuals subjected to it, and particularly those of Black and brown detainees.

51.     In the early morning of August 20, 2024, a convoy of Albany County officers arrived at OCCF. Approximately 19 Albany CERT deputies, dressed in full tactical gear (green

military-style fatigues with "Sheriff" patches), traveled to Oneida County in marked vehicles including a large Albany County Sheriff bus (as shown in the photos above, *see* ¶¶ 10, 39). Upon information and belief, Chief Kinderman held a briefing with the assembled teams. Upon information and belief, Oneida SERT officers were explicitly ordered not to interfere with the actions of the Albany County CERT officers, who were going to show the incarcerated individuals "how it's done"; in other words, Kinderman instructed his Oneida officers to stand down and allow the Albany deputies free rein in handling and ultimately assaulting incarcerated individuals. Upon information and belief, the plan was that Albany's team would take the lead entering each housing unit and making first contact with incarcerated individuals, while Oneida's team would provide support (securing perimeters, operating cameras, and opening cell doors on Albany's command).

52.    At approximately 9:30 a.m. on August 20, 2024, the joint CERT/SERT raid commenced. The teams sequentially swept through multiple housing pods over the next two to three hours, including general population Pods 5, 6, 7, 8, and protective custody Pod 4. The operation was highly coordinated and consistent across all pods: officers moved in formation, shouting commands, and simultaneously breaching cells. By design, the Albany County deputies (green uniforms) were the ones to directly engage with most incarcerated individuals, while the Oneida officers (black uniforms) mostly hung back, watched, assisted only as directed, but never intervened. The involvement of Oneida's supervisors in planning and observing the raid — coupled with their deliberate decision to cede front-line authority to the Albany team — evidences an agreement between the counties to carry out the operation in a particularly aggressive manner. With Albany officers wearing no body cameras, and no K-9s present for the purposes of evidence gathering, the operation was primed for enacting violence and demonstrating force rather than legitimate safety and security reasons.

## 2.  Pattern of Excessive, Racially Targeted Force

53.     As the CERT officers poured into each pod, they ordered all incarcerated individuals to get down on the ground or face the wall. The units were caught by surprise, and, on information and belief, no resistance or disturbance was made by any incarcerated individual. The officers, nevertheless, employed extreme force across the facility, focusing on Pods 5, 7, 8, and 4, which overwhelmingly housed Black and Latino incarcerated individuals (Pod 6, which is overwhelmingly white due to privileged placement programs, was mostly spared violence). During the incident, numerous incarcerated individuals were forced to the floor, handcuffed, and then violently beaten. Albany deputies delivered punches, kicks, and strikes, and deployed pepper spray directly into restrained incarcerated individuals' faces and eyes. This exact pattern was repeated in each Pod, while Oneida personnel either looked on or intentionally angled their body-worn cameras away to avoid recording the unconstitutional, unwarranted abuse. If any contraband was recovered during the sweep, it was only after incarcerated individuals had been subdued; at no point was there a riot, fight, or safety emergency that could justify the level of force used.

54.     The Albany County CERT, with the assistance of Oneida County SERT, raided two or three general population pods with extreme violence before they were allowed access into a special housing unit housing vulnerable and medically disadvantaged detainees—formerly known as "protective custody"—which generally requires heightened security and a more strenuous duty to protect. In other words, high-ranking policymaking officials, including Defendants Kinderman, Smith, Paternoster, and Apple, had plenty of time to correct the action, cancel operations, and disallow unconstitutional behavior on their premises. Instead, those Defendants ratified the unconstitutional and unlawful actions of their officers and ordered and/or encouraged the

CERT/SERT members to carry out the same unconstitutional force and gratuitous infliction of pain executed against those in Pod 8 onto those housed in Pod 4.

55.     The brunt of the violence was inflicted on non-white incarcerated individuals. Officers appeared to single out Black and Latino detainees for the most brutal treatment, often with derogatory or taunting comments. For example, in Pod 4, an Oneida officer (Officer Giambattista) remarked after the assault, *"That's what we do, that's how we control you guys,"* – indicating that such violence was reserved for "you guys" (the predominantly Black and Latino incarcerated individuals). By contrast, white incarcerated individuals were not targeted with comparable force; they were handled more gently or not assaulted at all. The operation thus took on a racially charged character. As Albany officers brutalized incarcerated individuals, they shouted "This is how Albany County gets down!" – a boastful declaration heard by several victims, emphasizing that the outside team was there to terrorize. Such wanton cruelty, targeting and humiliating of an incarcerated individual in that manner, is demonstrative of the unchecked excesses of the raid. Plaintiffs' experiences on August 20, 2024, illustrate the calculated, racially targeted brutality of the raid.

**B. Jose Claudio**

56.     On the morning of August 20, 2024, Mr. Claudio was doing his usual routine of pushups and drinking coffee in the common areas of the pod when he observed several Albany CERT officers wearing green run into Pod 8 and scream at the residents to get on the floor.

57.     Three officers shoved Mr. Claudio to the ground.

58.     Mr. Claudio stayed on the ground on his stomach for approximately 30 to 40 minutes. During this time, a CERT member who was a short, baldheaded, stocky white man who had been giving orders to the other CERT officers in the pod knelt down next to Mr. Claudio. He

began antagonizing Mr. Claudio as if he was resisting. In fact, Mr. Claudio was not speaking to the officer in any way and did not resist or antagonize him in any way.

59.     Eventually, the same CERT member grabbed Mr. Claudio's arm, twisted it behind his back, walked him to his cell, and sat him outside of his cell.

60.     The same officer waited with Mr. Claudio outside of his cell and antagonized Mr. Claudio while it was ransacked by four additional Albany CERT officers who had entered it. Those officers, all of whom were white and wearing green, threw his belongings all over the cell, stepped on his food, put some food and clothing items in the toilet, and yelled at him.

61.     The short, stocky CERT member who had pulled Mr. Claudio to the outside his cell then grabbed the back of Mr. Claudio's shirt and had him get up. That CERT member walked Mr. Claudio to his bed and told him to wait with his knees touching the bed.

62.     Mr. Claudio then felt a punch to his head. An officer tripped him by grabbing the back of his shirt and kicking his legs, causing Mr. Claudio to fall to the floor. An officer then threw a blanket over his head, as all five officers began kicking and punching him. Mr. Claudio felt dozens blows on the back of his head, face, ribs, back, and arms.

63.     Mr. Claudio was in pain and worried that the beating would never stop. He was fearful for his life and found it difficult to breathe.

64.     Mr. Claudio did not resist, physically or verbally, while he was getting beaten.

65.     During and after the beating, several of the officers stated, in substance, "this is how Albany County gets down."

66.     The Albany CERT officers left Mr. Claudio's cell, closing the door and locking Mr. Claudio in behind them.

67.     While Albany CERT officers were ransacking the cells in Pod 8 and beating the other people housed there, Mr. Claudio observed approximately five or six Oneida SERT officers walking around the pod, including Sergeant Paternoster, who also participated in searching cells.

68.     The Oneida SERT officers, who were wearing body-worn cameras, purposefully moved out of the line of sight into cells in which people were being beaten. No Albany CERT officers were wearing body-worn cameras or name tags.

69.     These Oneida SERT officers, including Paternoster, had notice and a reasonable opportunity to intervene as incarcerated people were being beaten, but did not.

70.     Mr. Claudio's cell was the last to be searched in Pod 8. Approximately ten minutes after leaving Mr. Claudio's cell, the Albany CERT members left the pod, along with all but approximately one or two Oneida officers.

71.     After the Albany CERT officers left his cell, Mr. Claudio looked in the mirror and observed that the underside of his right eye was swollen and bruised. He also noticed that his left front tooth was chipped and the chipped piece of tooth was still in his mouth. He felt pain in his neck, face, and body.

72.     After noticing his injuries in the mirror, Mr. Claudio stood at his door and yelled for medical attention. No officers answered his calls for help.

73.     Mr. Claudio specifically called out for Sgt. Paternoster as he passed in front of Mr. Claudio's cell. Sgt. Paternoster looked at Mr. Claudio briefly before turning and walking away without responding.

74.     Approximately 30 minutes after the incident, Mr. Claudio was told he had a visitor, and he met with his fiancée, Keonna Williams, in the visitation room. There, he disclosed what had happened. Ms. Williams was shocked and upset about Mr. Claudio's account and the visible

injuries, including a swollen bulge under his right eye, which was black and blue, a chipped tooth, and marks on his neck.

75.     After visiting with Ms. Williams, Mr. Claudio wrote her a message telling her, "I am scared for my life right now" and, "just in case u don't hear from me after this message I love u till the end of time my love."

76.     On his way to and inside of the visitation room, Mr. Claudio asked two additional Oneida staff for medical attention, including an Oneida lieutenant and Officer Behr. The lieutenant responded, "we're getting to it," and Officer Behr stated that she would see what she could do.

77.     After returning to Pod 8, Mr. Claudio discovered that other people housed in his pod also had visible injuries, including one whose face was swollen past the point of recognition, another who had an open wound on his face, and some who had bruises to their ribs and faces.

78.     After the visit with his fiancée, Mr. Claudio went to triage, where he complained of right cheek pain. RN Goodwin, who treated him at triage, noted superficial scratches on his right neck.

79.     The next day, August 21, Mr. Claudio woke up feeling light-headed and dizzy and suffering from a migraine. These symptoms worsened throughout the day. After attending a Grand Jury appearance that day, Mr. Claudio met again with his fiancée in the visitation room. As he began experiencing more dizziness and pain, Mr. Claudio requested that Officer Behr call medical. Thereafter, Mr. Claudio was sent to the infirmary.

80.     At the infirmary on August 21, Mr. Claudio complained of pain on the right side of his ribs and pain while breathing, along with headaches and dizziness. The nurse noted a small ecchymosis under his right eye, a possible small ecchymosis to the right parietal of his head, and

a possible mild raise to the scalp. Staff in the infirmary did not take any photographs, despite Mr. Claudio's request. Mr. Claudio was placed under observation with neuro checks every four hours.

81.    Mr. Claudio was released from the infirmary the following day. He requested an MRI, which he received on September 3. But Mr. Claudio never received the results of the MRI.

82.    Following his release from the infirmary on August 22, Mr. Claudio submitted sick slips approximately twice a week for several months complaining of neck pain and headaches.

83.    He was seen again at the infirmary on August 26, where staff took x-rays of his neck. Mr. Claudio did not receive the results of the x-rays.

84.    To this day, Mr. Claudio continues experiencing neck pain that began after the incident and has not improved since the incident. He has a limited range of motion and is unable to fully turn his neck or tuck his chin down.

85.    Mr. Claudio also frequently wakes up with migraines, which he did not experience before the raid.

86.    He has difficulty sleeping and tosses and turns due to headaches and anxious thoughts about the traumatic event.

87.    Mr. Claudio never received treatment for his chipped tooth.

## C. Willie Gosier

88.    On the morning of August 20, 2024, Mr. Gosier was being held in Pod 8, Cell 19. He had just finished brushing his teeth in his cell when Albany County officers stormed Pod 8. Mr. Gosier noticed that the doors to the cells in Pod 8 were locked before the Albany CERT officers entered the pod.

89.     Locked in his cell, Mr. Gosier watched through the window on his door as the Albany CERT members began handcuffing other incarcerated individuals who had been told to lie on the ground.

90.     Two Albany CERT officers wearing green shirts then entered Mr. Gosier's cell and ordered him to exit his cell while they handcuffed him. One was a tall white man with a beard and hair and the other was a shorter bald man. With his hands cuffed behind his back, Mr. Gosier was taken outside of his cell, seated in front of the door and positioned looking out toward the day room, where he observed Albany CERT officers strip-searching other prisoners. Mr. Gosier's cell was then searched.

91.     After completing their search of Cell 19, the two CERT Officers uncuffed Mr. Gosier, took him back into his cell, and ordered him to take his clothes off until he was fully nude. Mr. Gosier asked the CERT Officers to shut the door, but otherwise did not offer any verbal or physical resistance to the strip search order. Following this first strip search, Mr. Gosier put his underwear back on.

92.     The tall, bearded Albany CERT officer instructed the Oneida County CO controlling the locks to open Mr. Gosier's cell door. After it was opened, several Albany CERT Officers entered Mr. Gosier's cell. The officers told Mr. Gosier that they would be conducting another strip search, which Mr. Gosier questioned because he had just been strip-searched. The officers responded: "Because we want to."

93.     Following orders, Mr. Gosier stood up, turned around, put his hands on the wall, and kneeled on his bed. In response, a CERT officer yelled "stop resisting" and hit Mr. Gosier in the right side of his face with what Mr. Gosier perceived to be a hard object, causing Mr. Gosier

to lose consciousness. Mr. Gosier could not see the hard object because he was facing the other way.

94.     After regaining consciousness, Mr. Gosier was laying down on his bed on his stomach, getting kicked and punched in his back and legs by the CERT officers in his cell. The tall, bearded officer Albany CERT was kicking him, while three other officers, including one short officer with hair and two stocky baldheaded officers, punched him.

95.     Throughout the attack, Mr. Gosier did not resist or fight back. He was afraid for his life. During the beating, he was hit in his lower back, leg, and the right side of his face.

96.     Officers continued to yell "stop resisting" in an false and pretextual effort to suggest that their use of gratuitous force was somehow justified.

97.     Throughout the assault, Mr. Gosier felt terrified and confused by what was happening and feared that the beating was not going to end.

98.     As Mr. Gosier was being assaulted, other members of the Albany CERT team vandalized his cell and threw his soap, toothbrush, and comb pick in the toilet. They also threw Mr. Gosier's legal mail around his cell, with some of it ending up in the toilet.

99.     As the officers finished beating Mr. Gosier and left his cell, they warned him that he needed to stay where he was and not move, or they would continue beating him. Mr. Gosier lay in bed, terrified, until he saw the Albany CERT officers leave and shut his cell door.

100.     Mr. Gosier also heard and observed several other people housed in his pod get brutalized on August 20, 2024. For example, he overheard Mario Leslie and Izayah Johnson yelling out in pain and asking for help as CERT officers told them to stop resisting. He also observed David Roberts get kicked and punched by CERT officers while he was on the ground. Mr. Gosier spoke to Mr. Johnson through the vents following the beating, and both men expressed being in a

lot of pain. Mr. Gosier also observed physical injuries on Mr. Leslie, Mr. Roberts, and Mr. Claudio in the hours and days following the attack.

101.    During the attack, Mr. Gosier briefly lost consciousness. Upon regaining awareness, he was brutally kicked and punched. He sustained painful injuries to his lower back, right leg, and face resulting in swelling and bruising.

102.    Immediately after the incident, while Mr. Gosier was still locked in his cell, he requested that an officer bring him to receive medical attention. After no officer came, Mr. Gosier screamed from his cell that he needed medical attention. Despite his pleas, he was left for several hours without medical attention. While Oneida Officer Corcoran conducted rounds, Mr. Gosier informed him that he was injured and needed to see medical. Officer Corcoran responded that other people needed to see medical too, and that he would call medical, but later informed Mr. Gosier that the medical unit had not responded to his call.

103.    When he was finally let out of his cell, Mr. Gosier was limping because of pain in his leg. Mr. Gosier approached Oneida Officer Jordan Hoke and told him that he had needed medical attention for several hours and was in pain. His face was visibly bruised and raw. Officer Hoke did not express any direct knowledge about the attack, but told Mr. Gosier that the CERT team should not have treated the inmates that way.

104.    Eventually, Mr. Gosier was permitted to go to medical triage, which was right outside of Pod 8, where nurses noted what was hurting him and prescribed him ibuprofen. He then went back to the pod.

105.    In the weeks following the attack, Mr. Gosier complained of a bruise to his right forehead, difficulty walking, and shooting pain in his leg. He and his mother submitted several

requests for him to be seen by a doctor for several weeks before he was finally seen by a doctor at the jail on September 17, 2024.

106.    When he was finally seen by a doctor, Mr. Gosier described a painful, shooting sensation down his back and right leg, and that he was getting headaches several times a day. The doctor informed him that the sensation was symptomatic of nerve damage, and additionally noted "soft tissue injuries to the back, thigh, and face." Mr. Gosier was prescribed meloxicam.

107.    Mr. Gosier was not able to walk without a limp for several weeks. Even after he regained the ability to walk normally, he continued to suffer from leg pain.

108.    Mr. Gosier also experienced mental health symptoms related to trauma from the attack. He visited the mental health unit at Oneida and informed providers there that he would get flashbacks to the incident when he heard keys or a door opening. The flashbacks caused him anxiety, and he experienced nightmares. The providers informed Mr. Gosier that, because the incident was under investigation, there was little assistance they could provide to him beyond listening to him.

109.    Mr. Gosier continues to experience nightmares about the incident that feel as if he is reliving it. He also continues to suffer from anxiety brought upon by certain triggers, such as the sound of keys or the door locking, or uniforms in the color green that resemble the color worn by the Albany CERT members, such as the uniforms worn by the National Guard.[1]

110.    Mr. Gosier also continues to suffer from leg and back pain, which worsen when he stands for a long time or moves too suddenly. The pain has affected Mr. Gosier's ability to play

---

[1]    Mr. Gosier is currently incarcerated in DOCCS custody. In light of wildcat strikes by DOCCS officers and widespread staffing shortages, the National Guard has been mobilized in DOCCS facilities for much of 2025. Mr. Gosier recalls National Guard members storming his unit at Cape Vincent Correctional Facility after a fight in approximately March 2025.

basketball and work out. He also suffers from headaches that did not occur before the incident. Mr. Gosier tosses and turns in his sleep and has difficulty sleeping because of pain.

**D. Izayah Johnson**

111.    Mr. Johnson was housed in Pod 8, Cell 20.

112.    Mr. Johnson was sitting in the dining area of Pod 8 when approximately 20 officers, many wearing green, entered the pod yelling, "everybody get the fuck on the ground." Mr. Johnson immediately dropped to the ground and observed one officer tackle another inmate to the ground.

113.    As the officers began calling out cell numbers and entering cells for searches, Mr. Johnson remained on the ground. He observed as the officers began trashing cells throughout the unit.

114.    Several Oneida officers were present as the Albany CERT officers raided the individual cells, including Sergeant Paternoster, Officer Jones, and an officer who was young, tall, and heavyset. As the Albany CERT officers beat incarcerated people in their cells, these officers turned away and chose not to do anything.

115.    Approximately 10-20 minutes after entering the pod, an officer called Mr. Johnson's cell number, grabbed him from the floor, and sat him in the doorframe to his cell.

116.    As approximately two or three officers entered searched Mr. Johnson's cell, he pleaded with them not to trash his cell or destroy his legal paperwork. The officers responded by telling Mr. Johnson to face forward (away from his cell). Mr. Johnson did not obstruct the search in any way.

117.    Two officers began to strip search Mr. Johnson by telling him to remove articles of clothing. During the search, the officers ordered Mr. Johnson to turn around, squat, and cough, and then turn to face them and do the same. Mr. Johnson covered his genitals while facing the officers,

and an officer instructed him to let go of his genitals and lift them up so the officers could view the area below the genitals.

118.    One of the officers conducting the strip search commented, "that's a big one," referring to Mr. Johnson's penis.

119.    Following the strip search, the officers left Mr. Johnson's cell and closed the door. He heard the officers enter Plaintiff Mario Leslie's cell and beat him. He also heard as other inmates in Pod 8 began banging and yelling out at the officers that what they were doing was illegal. Mr. Johnson also remarked that the officers' actions were illegal.

120.    As he passed by Mr. Johnson's cell, an Albany CERT officer paused and looked at Mr. Johnson and told him, "say one more word," to which Mr. Johnson responded by putting his hands in the air and nodding his head.

121.    The officer then instructed Mr. Johnson's cell to be re-opened and ordered Mr. Johnson to get down onto his knees and place his hands behind his back, facing away from the entrance of the cell.

122.    Another officer entered the cell and kicked Mr. Johnson in the middle of his back, pushing him forward so that his face (specifically, the area above his left eye) hit the ground. While Mr. Johnson was on the ground, additional officers entered his cell.

123.    Two officers then grabbed Mr. Johnson's arms and dragged him further into the cell. An officer began stomping on his back while another stomped on his legs. Simultaneously, another officer began kicking Mr. Johnson's face.

124.    The officers taunted him by saying things like, "you're not so tough now."

125.    During the beating, Mr. Johnson lost consciousness.

126.    When Mr. Johnson regained consciousness, he observed the officers walking out of his room and closing his door.

127.    After some time, Mr. Johnson retrieved his tablet and wrote a message to his significant other describing that he had just been beaten by several officers.

128.    Outside of his cell, Mr. Johnson overheard officers beating Plaintiff Willie Gosier as they repeatedly told him, "stop resisting," and Mr. Gosier repeatedly answered, "I'm not resisting." During the beating of Mr. Leslie, Mr. Johnson also overheard Mr. Leslie tell the officers, "I'm not resisting."

129.    After being released from his cell that afternoon, Mr. Johnson observed that Plaintiff Jose Claudio's face was severely injured.

130.    One of the Oneida officers who was in Pod 8 that day told Mr. Johnson, in substance, that he would like to speak with Mr. Johnson's lawyer because he believed that what happened during the incident was wrong.

131.    After the beating, Mr. Johnson developed a bleeding knot in the middle of his forehead. His right cheek had swelled and a red, swollen footprint mark was left on his face from the officer who had kicked him there. Mr. Johnson also had scrapes on the back of his legs and his back.

132.    After Albany CERT officers left Pod 8, Mr. Johnson requested medical care from an Oneida officer. The officer responded that Mr. Johnson would have to wait because there was a line of inmates who also needed medical care.

133.    Mr. Johnson's mother, Yajaira Amaro, also called OCCF several times on August 20, 2024, to demand that Mr. Johnson receive medical care.

134.    Mr. Johnson was sent to the infirmary around 1:30 p.m. the day of the incident. Because his injuries prevented him from walking on his own, Mr. Johnson was escorted to the infirmary by approximately six officers, including both Oneida and Albany CERT officers. Oneida body camera footage from Mr. Johnson's trip to the infirmary captures several officers grinning and/or laughing while Mr. Johnson enters and is examined inside the infirmary, visibly in pain.

135.    At the infirmary, he received an x-ray of his right leg. No acute abnormality was noted in the results.

136.    Mr. Johnson requested that an Oneida sergeant take photos of his face, specifically the footprint, for evidence. The sergeant only took photos of his legs and knees.

137.    Following the raid, Mr. Johnson began experiencing symptoms of depression and anxiety. He requested to see mental health at OCCF on several occasions following the incident, but was told only to "be patient."

138.    Eventually, several weeks after the incident, Mr. Johnson was seen by the mental health unit. However, mental health providers at OCCF informed Mr. Johnson that they were forbidden from speaking about the incident.

139.    Since being transferred to DOCCS custody, Mr. Johnson has sought additional mental health support for symptoms related to the incident.

140.    Mr. Johnson suffers from flashbacks about the incident what are triggered by the sound of keys, radios, or officers making rounds at night. He has trouble sleeping and sweats at night due to anxiety. He periodically experiences hot flashes when his anxiety about the event is triggered.

141.    On one occasion approximately three months after the incident, Mr. Johnson had hot flashes and symptoms of a panic attack that were brought on from being triggered after seeing

officers run into his pod after a fight broke out. Mr. Johnson experienced intense fear, trouble breathing, and a rapidly developing rash. Officers in the jail called a "Code Blue" after witnessing Mr. Johnson's rapid deterioration.

142.    Mr. Johnson has also developed headaches following the incident for the first time in his life. Sometimes, the headaches are so bad that Mr. Johnson is forced to sit still or lay down for several hours to a day. The headaches are often accompanied by dizziness or nausea, and significantly impair his ability to enjoy day-to-day life.

143.    Mr. Johnson also continues to suffer from other physical symptoms related to the assault, including pain and stiffness in his right leg and middle-lower back problems. The pain in his legs and back contribute to difficulty sleeping, as well as other limitations in his movement, including difficulty bending over and climbing into his top bunk bed.

**E.  Mario Leslie**

144.    Mr. Leslie housed in Pod 8, Cell 21 on August 20, 2024. That morning, he was waiting to play chess in the main room at approximately 10:30 or 11:00 a.m. when the door to the pod opened and officers entered. Several officers yelled, in substance, to get on the ground.

145.    Mr. Leslie immediately complied with the officers' orders, lying down on his stomach on the floor and spreading his hands on the ground. He also saw all other inmates in his vicinity immediately comply with their orders. Mr. Leslie stayed on the ground in this position for approximately 15 to 20 minutes.

146.    The officers instructed the inmates who were in their cells to come out into the main room and lie on the ground. While Mr. Leslie and the other inmates remained on the ground, the officers grabbed inmates one-by-one and brought them back to their cells for searches.

147.    An Albany CERT officer grabbed Mr. Leslie and brought him toward his cell, sitting him on the side of his cell door so he was unable to see what was happening in his cell.

148.    Approximately six or seven Albany CERT officers entered his cell to search it. Mr. Leslie did not verbally or physically resist the search in any way.

149.    When he was brought back into his cell, Mr. Leslie observed that the officers had trashed it.

150.    A short Albany CERT officer wearing a green baseball cap then directed Mr. Leslie to face away from him as he began to strip search him by issuing orders that he remove specific articles of clothing. Mr. Leslie was surprised to be facing away from the officers, as he was previously directed to face toward officers during the strip search at the facility at intake.

151.    Without resisting, Mr. Leslie was stripped down to his boxers and socks. He stood awaiting further instructions with his hands at his sides.

152.    Between four and six Albany CERT officers then attacked Mr. Leslie from behind. He was struck forcefully between the middle and right side of his neck, causing him to fall forward from the impact. As he fell, the right side of Mr. Leslie's forehead struck the wall.

153.    Mr. Leslie observed a bald-headed stocky officer in a green shirt with black letters sitting on his bunk as he was being punched.

154.    When Mr. Leslie fell on his side, officers began punching him, and he curled up in an effort to protect himself.

155.    Officers instructed Mr. Leslie to put his hands behind his back and handcuffed him. Mr. Leslie did not resist.

156.    The CERT officers positioned Mr. Leslie so that half of his body was on the bed and the other half was off the bed: His shins were on the ground and his waist on the bed.

157.    Despite the fact that Mr. Leslie was not resisting the CERT officers in any way, one or two yelled "stop resisting!"

158.    One CERT officer held Mr. Leslie's hands, which were cuffed behind his back. Mr. Leslie's knees were on the ground, and his upper body was against his bed. Other CERT officers began punching him in the back of his head and right side of his face. Another CERT officer grabbed his feet and bent them upward in a painful position.

159.    Mr. Leslie was punched multiple times by multiple officers. Although Mr. Leslie could not turn around to identify the officers who were beating him from behind, he had observed only Albany CERT officers in his cell at the time. He also knew that multiple officers were punching him because he could see a CO kneeling on his bunk punching him on the side of his face while he could feel that he was also being punched in the back.

160.    Mr. Leslie estimates that he was punched between five and seven times in his face with a closed fist. The officer who punched him in the face taunted Mr. Leslie with statements like, in substance, "oh you guys want to crack jokes," and "tell everybody at the jail how Albany do."

161.    At no point during the assault did Mr. Leslie resist, fight back, or try to get away.

162.    Mr. Leslie was afraid for his life.

163.    Eventually, the officers left and locked the door behind them. They uncuffed him, told him to lay on his bed, and said, in substance, "don't move until you hear the door close."

164.    After making sure all the officers had left, Mr. Leslie stood up and looked at his face in a mirror to observe his injuries. The right side of his face was badly swollen and red and purple in color. He saw blood in his right eyeball and had some difficulty seeing out of his right eye.

165.    Mr. Leslie then stood at his door and watched as CERT officers entered his neighbor's cell. After hearing rumbling and screaming from his neighbor's cell, Mr. Leslie watched as the officers left his neighbor's cell to enter cell 25, where one of the officers kicked the inmate inside.

166.    As a result of the assault, Mr. Leslie's face and neck were swollen and in pain, and his eye was bloody and swollen. He had grown a lump on the right side of his forehead from where his head hit the wall.

167.    Mr. Leslie asked the officer doing rounds to receive medical treatment, but his request was denied.

168.    When the inmates in Pod 8 were released from their cells around 4:00 p.m. on the day of the raid, Mr. Leslie raised his concerns to a lieutenant, Mr. Leslie was sent to the infirmary to get an ice pack. Mr. Leslie was given an ice pack and sent back to his cell.

169.    The following morning (August 21, 2024), Mr. Leslie woke up to throbbing pain in his head, back, and neck. He was dizzy, nauseous, and throwing up. He could not keep his balance to walk straight. His right eye had become puffier and darker in color, looking blacker and more purple.

170.    Other incarcerated people saw his condition in his cell and called for a correction officer. Mr. Leslie was escorted to the infirmary by an officer.

171.    When Mr. Leslie arrived at the infirmary, the nurses were shocked by his condition and the fact that he had not been taken to the hospital.

172.    RN Barbara Daley noted that the right side of Mr. Leslie's head had swelled significantly, he was vomiting, and his blood pressure was 167/97. Mr. Leslie described pain

behind his right ear, right side of the neck, and jaw. His right eye was partially swollen shut, ecchymotic (bruised), and red with blood.

173.    Medical staff at Oneida advised Sergeant Neve-Rinaldo that Mr. Leslie must go to the hospital, and he was transferred by ambulance that day.

174.    The ER nurse at the hospital noted "significant right facial and eye swelling" and difficulty looking to the right. Hospital staff diagnosed him with periorbital ecchymosis and subconjunctival hematoma and prescribed him with pain medication. Tests were performed to see if Mr. Leslie had any facial fractures; no definitive fractures were noted.

175.    Upon returning to Oneida, Mr. Leslie remained in the infirmary for four to five days. During this time, Mr. Leslie was administered eye exams, which he did not pass because he could not see the letters.

176.    When he was released from the infirmary, the swelling in his eye had begun to subside, but Mr. Leslie was left with a black ring around his eye for about a month and a half following the incident. The bleeding in his eye stopped approximately six days after leaving the infirmary.

177.    Following the assault, Mr. Leslie experienced high blood pressure for an extended period.

178.    Mr. Leslie continues to suffer from headaches, blurry vision, and occasional bouts of dizziness that began as a result of the assault. His vision issues and fears of reinjuring his face have affected his ability to play handball and exercise at the gym. He is sensitive to light and limits his time outdoors.

179.    Mr. Leslie also lives with symptoms of anxiety following the incident. He experiences flashbacks when he hears officers handle keys and open or close doors. He experiences sleep disturbances and jumps up at night when he hears officers.

**F. David Roberts**

180.    On the morning of August 20, 2024, Mr. Roberts was in Pod 8 playing chess with another inmate.

181.    Mr. Roberts noticed that Defendant Officers Paternoster and Holbert entered the pod for the apparent purpose of switching out with the current C.O. on duty, Officer Corcoran, despite the fact that it was not the usual shift change time.

182.    After Defendants Paternoster and Holbert entered the pod, Albany County CERT officers followed, storming into Pod 8.

183.    An Albany CERT officer ordered all incarcerated individuals to "Get the fuck on the ground!"

184.    Roberts began to comply, but because of a bad knee, he was still sliding off his chair when Albany County Officer B (*see* ¶ 37) slammed Mr. Roberts face down on to the ground.

185.    Mr. Roberts did not resist in any way. He laid on his stomach with his hands over his head as instructed by defendant officers.

186.    While lying on the ground, Mr. Roberts saw Defendant Paternoster by the computer desk that controls the opening and closing of cells in the pod.

187.    Mr. Roberts also observed Albany County and Oneida County officers enter cells, strip-search incarcerated individuals, destroy their property, and violently assault them, all while shouting "Stop resisting!" as a pretext to cover up their unlawful actions.

188.    At one point, Mr. Roberts witnessed Defendant Paternoster poke his head into a cell where another detainee was being strip searched and assaulted. Paternoster asked what was going on, to which Defendant Albany officers responded, in substance, "don't worry about," "get out of the unit," and "we got this"—a clear exemplification of the cession of front-line authority to Albany CERT, knowledge of the egregious constitutional violations taking place against complaint incarcerated individuals, and an evident failure to intervene.

189.    Shortly after witnessing the assault of several other detainees, Defendant Officer Paternoster searched Mr. Roberts's cell, strip searched him, and locked his cell door.

190.    While seated and locked in his cell, Mr. Roberts continued to witness the violent assault of neighboring incarcerated individuals and told defendant officers that what they were doing was illegal and that they should be wearing body worn cameras and name tags.

191.    In response, Albany Officer B threatened Mr. Roberts, saying, "Shut the fuck up, you are next." Mr. Roberts did not say anything else.

192.    Defendant officers stopped outside of Mr. Roberts's cell and Albany Officer B yelled at Mr. Roberts: "You got something to fucking say?" to which Mr. Roberts replied, "No sir."

193.    Defendant Officer B ignored Mr. Roberts and yelled, in substance, "I think you fucking do. Crack 25," ordering either Officer Paternoster or another Oneida Defendant John Doe to open the door to cell 25, Mr. Roberts's cell.

194.    The defendant Oneida Officer operating the computer booth of the pod complied with defendant Albany Officers' orders and opened Mr. Roberts door. Albany Officer A (*see* ¶ 34), Albany Officer B (*see* ¶ 35), and several other Albany officers entered the cell and ordered Mr. Roberts to stand up with his hands against the wall.

195.    Mr. Roberts complied with all orders.

196.    Albany Officer B handcuffed Mr. Roberts. Without resisting, Mr. Roberts politely asked why he was being placed in handcuffs.

197.    In response, Albany Officer B physically turned Mr. Roberts around to face him and asked, in substance, "You got something else to say?" Mr. Roberts replied again, "No sir," remaining peaceful and compliant throughout the interaction.

198.    Albany Officer B then punched the right side of Mr. Roberts's face and immediately thereafter, Albany Officer A forcefully tackled Mr. Roberts's legs, bringing him to the ground.

199.    Other defendant officers joined in and began brutally assaulting Mr. Roberts, all while yelling "Stop resisting!" despite the fact that Mr. Roberts was not resisting; he was lying on the ground handcuffed.

200.    Defendant officers continued to kick, punch, and stomp on Mr. Roberts, even as he slipped in and out of consciousness.

201.    Mr. Roberts lost consciousness twice during the assault. The first time, he woke up to defendant officers continuing to violently assault him, and the second time, he awoke locked in his cell, in a pool of his own blood after defendant officers had already left.

202.    As a direct result of the assault, Mr. Roberts sustained numerous serious injuries, including: a deep laceration above his right eye requiring several stitches, swelling that sealed his eye shut, an orbital fracture, and blurred vision.

203.    Despite Mr. Roberts's visible trauma and emergent condition, Mr. Roberts was forced to remain in his cell for several hours before he was taken to the infirmary.

204.    Instead of helping him, the Defendant Oneida and Albany officers mocked Mr. Roberts and laughed at him.

205.    Defendant Officer Corcoran replied to Mr. Roberts request for immediate medical attention and said, "it's very busy," "You're not the only person they hurt," and then threatened that "Albany County will get you," if Mr. Roberts complained.

206.    Defendant Jones told Mr. Roberts to put in a sick call through his tablet, which had been seized during the raid, demonstrating institutional negligence and deliberate deprivation of adequate and prompt medical care to incarcerated individuals.

207.    While in his cell, Mr. Roberts saw Albany County officers bring back Izayah Johnson from medical. While transporting Mr. Johnson to his cell, Albany County officers looked at Mr. Roberts and mockingly said, "Welcome to Albany County," and laughed at Mr. Roberts, as he stood locked in his cell, with a visibly bloodied and bruised face.

208.    Mr. Roberts was eventually taken to the OCCF infirmary, where he was examined by a nurse at Wynn Hospital via a Skype call, who determined that Mr. Roberts needed to go the hospital. He was transported to Wynn Hospital shackled in a squad car, not an ambulance.

209.    While being transported, Mr. Roberts was told by Oneida officers that "he [Mr. Roberts] shouldn't have said anything," reflecting institution-wide knowledge of the raid, and complacency with state-sanctioned unconstitutional violence, officers breaking the law, and the use of excessive force to brutally assault predominantly Black and brown incarcerated individuals.

210.    At Wynn Hospital, Mr. Roberts received stitches, a CAT scan, and an orbital fracture test.

211.    He was transported back to his cell in Pod 8 at around approximately 11:00 p.m. that same night and was unable to sleep that night due to the severe pain from the various injuries inflicted upon him during the raid. However, Mr. Roberts was not prescribed any pain medication.

212.    He requested stronger pain medication, but he was only given Ibuprofen and/or Tylenol for pain management from OCCF. At both the OCCF infirmary and at Wynn Hospital, Mr. Roberts requested that pictures be taken of his injuries, and both times, his requests were denied.

213.    Mr. Roberts was subjected to severe medical neglect in the aftermath of the incident. In the days and weeks following the incident, Mr. Roberts was in fear for his life and suffering from symptoms of PTSD.

214.    Mr. Roberts filed grievances within OCCF, which were denied, appealed, and then denied again. He faced retaliation for filing these grievances; defendant officers mocked, threatened, and spread rumors about Mr. Roberts being a "snitch," causing him to be placed in Pod 3 as a trustee for his own protection.

215.    The assault left Mr. Roberts with new and lasting psychological and physical injuries. Since the incident, he has experienced symptoms of PTSD including persistent anxiety, hypervigilance, nightmares, depression, and difficulty sleeping, all of which he attributes to the beating and fear of retaliation inside the jail.

216.    Mr. Roberts now suffers from severe migraines, blurred vision in his right eye due to a scratch in his cornea, chronic pain in his right eye, and a permanent scar above his right eye.

217.    Medical records from the days following the incident documented visible, open lacerations on the right side of Mr. Roberts's face and noted that his eye was swollen shut.

218.    Medical records state that Mr. Roberts's injuries were too extensive to be treated within OCCF and that he needed to be taken to the hospital immediately.

219.    These injuries—both psychological and physical—have required ongoing treatment and have permanently altered Mr. Roberts' health and well-being.

**G.  Gamein Wright**

220.    Around approximately 12:00 p.m. on August 20, 2024, Mr. Wright was in the visiting room in Pod 4 on the phone with his friend Sadie Torres when he saw Albany CERT officers in green uniforms flood the hallway and begin shouting at everyone to "Get the fuck on the ground!"

221.    While on the phone, Mr. Wright saw Oneida Defendant Pease standing and looking in as defendant Albany officers brutally assaulted another detainee, Brandon McNair.

222.    Immediately after witnessing this assault, which was apparent from the cloud of mace seeping out of the cell, Defendant Pease rushed into the visiting room and ordered Mr. Wright back to his cell.

223.    As he was escorted through the pod by a defendant Albany officer, Mr. Wright saw fellow detainees sitting on their hands outside visibly destroyed cells—personal property scattered everywhere, belongings destroyed, and bedsheets soiled—and he was told by officers not to speak.

224.    Mr. Wright complied and sat on his hands outside of his cell, while Albany County CERT officers searched his cell.

225.    After Albany officers searched Mr. Wright's cell, they ordered him inside for a strip search. Two Albany officers watched as he faced the wall and removed his clothing, as instructed.

226.    As Mr. Wright was removing his clothing, one Albany officer struck him in the face without cause or justification. Mr. Wright tried to turn around and see who hit him and noticed that none of the officers were wearing name tags.

227.    Mr. Wright politely questioned the lack of name tags, and, in a deliberate act of humiliation, the officers forced him to strip completely naked.

228.    Immediately thereafter, once Mr. Wright was fully naked, defendant Albany officer hit him in the right side of his torso, knocking him to the ground.

44

229.   As he fell to the ground, Mr. Wright explained that his left arm was already injured from a prior shooting.

230.   Ignoring his pleas, Defendant Officer G dug his boot into Mr. Wright's back while Defendant Officer T pressed his foot onto Mr. Wright's injured left hand. Defendant Officer T laughed and said, "We could kill you; do you want us to kill you?"

231.   The defendant Albany officers then ordered Mr. Wright to stand up and face the wall, to which he complied fully. Mr. Wright informed officers that he had a private attorney, to which the officers scoffed saying that lawsuits never go anywhere.

232.   Defendant officers then resumed punching, kicking, and stomping on Mr. Wright in the back and neck as he fell to the ground naked and helpless. Although Mr. Wright's only movements were attempts to relieve the pain and difficulty breathing caused by the metal bed frame pressing against his chest, officers yelled "Stop resisting!" and continued their assault.

233.   Mr. Wright made several pleas for help, calling out, "Cell 45, these officers came in my room and put their hands on me."

234.   Additional Albany deputies and Defendant Officer Holbert entered Mr. Wright's cell. One officer asked what was going on and another Albany officer explained the attack by saying Mr. Wright was "acting tough." However, throughout the assault, Mr. Wright never fought back or resisted, he complied with all orders even as the beating continued.

235.   Mr. Wright told Officer Holbert that the Albany deputies were attacking him and were not wearing body-worn cameras. Officer Holbert simply laughed and showed his own camera to Mr. Wright. After the officers left, Mr. Wright could hear them assault the incarcerated individual in the cell next door to his.

236.    As a direct result of the assault, Mr. Wright sustained numerous serious injuries, including: swelling on the right side of his face that took weeks to subside, a suspected hairline fracture and nerve damage in his left wrist and arm, persistent back pain, and hearing loss in his right ear.

237.    Despite Mr. Wright's visible trauma and emergent condition, he did not receive medical treatment until 1-2 weeks after the incident. Following the assault, Mr. Wright immediately requested medical attention and his tablet to submit a grievance.

238.    Oneida officers told him to "put in a sick call," but refused to return his tablet, which had been confiscated during the raid. When Mr. Wright was released from his cell, he and several other injured detainees again asked for medical care, but a defendant Oneida officer said they had to wait for orders from the "Captain."

239.    Instead of helping him, the Defendant Oneida and Albany officers refused Mr. Wright medical care. The retaliatory culture deterred proper medical care: requests were mislabeled, incarcerated individuals were denied of the very means to request medical attention, visits were delayed, and even when Mr. Wright was seen by medical staff, his medical issues were downplayed and/or misrepresented.

240.    In the days and weeks following the incident, Mr. Wright submitted multiple medical requests, and complained to several defendant Oneida Officers about the severe pain he was experiencing in his wrist, face, and back. However, Mr. Wright did not receive any medical attention until one to two weeks after his assault.

241.    When he was finally seen, staff falsely recorded the visit as a dental issue rather than an ear injury he sustained during the raid. They gave him antibiotics and ibuprofen, and

eventually prescribed a muscle relaxer for his left arm. Despite his repeated complaints of severe pain and hearing loss, no meaningful specialist care or mental-health services were provided.

242.     The assault left Mr. Wright with new and worsening psychological and physical injuries. Mr. Wright now suffers from chronic nerve pain in his left arm, which he did not suffer from prior to the incident. Since the incident, he has experienced symptoms of PTSD including persistent anxiety, hypervigilance, nightmares, depression, and difficulty sleeping, all of which he attributes to the beating and fear of retaliation inside the jail. These injuries—both psychological and physical—have required ongoing treatment and have permanently altered Mr. Wright's health and well-being.

### H.  Ajarel Patterson

243.     On August 20, 2024, Mr. Patterson was housed in Pod 8. Albany CERT officers entered Pod 8, shouting for everyone to get on the ground. Patterson complied, lying on his stomach with his hands above his head.

244.     While lying on the ground, Mr. Patterson saw an Albany officer tackle an incarcerated individual, without cause or justification, immediately upon entering the pod.

245.     Shortly thereafter, Officer Holbert strip-searched Mr. Patterson in his cell, searched his cell, and then closed and locked his cell door. From the inside of his cell, Mr. Patterson saw Albany officers flipping tables and chairs in the middle open area of the lower level of the pod. Mr. Patterson saw Defendants Holbert and Paternoster standing nearby during this.

246.     From his cell, Mr. Patterson saw Albany CERT reopen and enter previously searched and secured cells. He identified Defendant Officer S as one of the primary officers spearheading the assaults and shouting, "Who has a problem?" and "Who has something to say?" Mr. Patterson remained silent and in his cell.

247.    When Albany CERT reached his cell, Defendant Officer S yelled "You got something to say?" Mr. Patterson replied, "I got nothing to say," to which defendant officers lied and said they heard Mr. Patterson talking from his cell.

248.    Defendant Albany officers then ordered Mr. Patterson to stand up, face his bed, and place his hands above his head in the air. Mr. Patterson immediately complied. Defendant Officers A, B, G, and S entered Mr. Patterson's cell, despite the fact that it too had already been searched and secured by defendant Officer Holbert, no contraband had been found, and that Mr. Patterson had complied with all orders.

249.    Immediately thereafter, without cause or justification, defendant officers began brutally assaulting him. Mr. Patterson did not resist; upon impact, he fell to the floor and curled into a fetal position while being repeatedly and violently kicked, punched, and stomped on in the back, head, neck, shoulders, legs, and ribs.

250.    During the assault Mr. Patterson lost consciousness and awoke as officers were exiting his cell. Mr. Patterson looked in the mirror to find blood running down his face; coming from his mouth, nose, left eye, and the back of his leg; and swelling and bruising in his face and back.

251.    As a direct result of the assault, Mr. Patterson sustained numerous injuries, including bleeding from his mouth, nose, and eye; swelling and bruising around his lip, eye, ribs, and leg; persistent migraine headaches; and chronic back and shoulder pain.

252.    Despite Mr. Patterson's visible trauma and emergent condition, he did not receive immediate medical treatment. Immediately following the assault, Mr. Patterson used the call button in his cell to request medical attention, but his request was ignored.

253.    Mr. Patterson was let out of his cell before dinner when he again requested medical attention and complained about his pain and injuries several times to multiple defendant officers, including Defendant Corcoran, but to no avail. Mr. Patterson was also unable to request a sick call through his tablet because it had been blocked from sending such messages, a prime example of institutional negligence and deliberate deprivation of adequate and prompt medical care to incarcerated individuals.

254.    Mr. Patterson did not receive medical attention until two full days after the incident, when he was taken to the triage unit and then admitted into the infirmary for three days due to the extent of his injuries.

255.    OCCF medical records document Mr. Patterson's visible injuries, noting that he was limping when he entered the infirmary, had bruising to his nose and left cheek, swelling on the right side of his mouth, and a swollen and busted lip.

256.    Records also note that Mr. Patterson was visibly experiencing severe pain in his ribs. Approximately over two weeks after his infirmary visit, Mr. Patterson received an x-ray of his ribs and requested his head also be examined because he began to experience severe migraines after the assault. A doctor prescribed him Excedrin, which provided no significant relief to his migraine condition.

257.    Despite Mr. Patterson's extensive injuries and severe pain, OCCF medical staff downplayed his injuries as superficial, failing to provide him with timely and adequate medical care.

258.    The assault left Mr. Patterson with lasting psychological and physical injuries. Since the incident, he has experienced symptoms of PTSD including persistent anxiety,

hypervigilance, nightmares, depression, and difficulty sleeping, all of which he attributes to the assault on August 20, 2024, by defendant officers.

259.    Mr. Patterson submitted grievances to OCCF, which were supposed to be evaluated by the Use of Force Committee, but never were.

260.    Mr. Patterson, who prior to the incident was an avid reader, now has difficulty reading because of the severity of his migraines, which have remained untreated.

261.    The injuries from the incident have also affected Mr. Patterson's ability to exercise and play basketball regularly.

262.    Mr. Patterson is now triggered by the sound of keys and cell doors opening, experiences severe insomnia which has cascaded into several other issues, such as aggression and paranoia. Despite his repeated complaints of severe pain, sleep deprivation, and mental health issues, and several corresponding requests for mental health treatment, no meaningful specialist care or mental-health services were provided.

263.    These injuries—both psychological and physical—have required ongoing treatment and have permanently altered Mr. Patterson's health and well-being.

264.    The assaults of Plaintiffs on August 20, 2024, reflect a coordinated and sanctioned culture of sadism, racism, and institutional deception: the fabricated "stop resisting" commands, the complete lack of incident reports or disciplinary charges afterward, and the direct contradictions between Chief Kinderman's written statement to the Attorney General (further described below) and what is clearly visible and audible on video. Plaintiffs were compliant and polite detainees who were subjected to unjustified and inhumane acts of violence without any cause or justification. Defendants failed to provide timely or adequate medical and mental-health care: all Plaintiffs received only cursory assessment and monitoring, were told to submit a routine

sick-call request in lieu of emergent treatment, denied access to the means to submit such a request, and no meaningful therapeutic intervention was ever initiated. These failures left Plaintiffs' post-assault symptoms unaddressed and contributed to ongoing harm. Every officer present either took part or stood by, reflecting a culture of coordinated brutality, retaliation, and code-of-silence enforcement within both counties' correctional ranks.

### I. Facility-Wide Injuries and Grievances from the August 20, 2024, Attack

265.    Plaintiffs were far from the only victims of the brutal attack on August 20, 2024. Defendants' actions that day caused injuries to incarcerated individuals throughout OCCF. These incarcerated individuals have reported injuries including blunt force trauma to the face, lacerations, broken noses, concussions, head trauma, swelling, eye injuries, and sexual assault, among many others.

266.    Indeed, the injuries were so widespread and obvious that even a jail lieutenant who saw some victims in the hallway noted multiple incarcerated individuals with visible facial injuries. Lt. Robert West stated in email correspondence to Defendant Kinderman that several incarcerated individuals looked terrible and even worse the next day.

267.    In the 72 hours following the raid, upon information and belief, dozens of incarcerated individuals filed grievances or written complaints, all describing a similar pattern of unprovoked excessive force. Incarcerated individuals from different housing units—some acting individually, others in groups, others through friends or family—submitted grievance forms, sick-call requests, and "ASK" messages (OCCF's kiosk messaging system) pleading for medical attention and outside investigation. For example, one incarcerated individual wrote *"they punched me in the side of the head on my right ear and right eye, I have a major headache and my right eye hurts"*; another stated, *"my arm is swelling up, need to be seen asap."*

268.    Many specifically accused Albany's CERT of brutality and begged that the "proper authorities" be notified instead of just the officers who stood by and watched the raid commence. OCCF Investigator Miller received dozens of reports from incarcerated individuals and detainees, which he ignored. The remarkable volume of grievances and their consistent content demonstrate that what happened on August 20, 2024, was not a few isolated incidents or miscommunications – it was a jail-wide planned attack. All the complaints alleged substantially the same misconduct: the Albany CERT officers, with the assistance of the Oneida County Jail Defendants, assaulted compliant incarcerated individuals, and left serious injuries in their wake.

**J.    Systemic Cover-Up and Intimidation**

269.    Rather than address the avalanche of grievances and obvious misconduct, Oneida County officials moved to cover it up. Despite the multitude of use-of-force incidents that day, zero formal "use of force" reports stemming from the raid were filed by Oneida County Sheriff or Albany County Sheriff personnel. A subsequent internal memo (by Lt. West on August 28, 2024) confirmed that, upon searching, no incident reports were filed relevant to any of the excessive force claims – e.g., *"Inmate McNair was pepper sprayed while in his cell without an incident report being generated or anyone owning their actions."* In other words, not a single officer admitted to using force or documented the injuries they inflicted, even where policy required it. Lieutenant West personally observed several incarcerated individuals with visible injuries immediately after the raid (and worse injuries the next day), yet none of the involved officers ever came forward to "own" the pepper-spray or beatings. In fact, when West asked several incarcerated individuals who had hurt them, each replied *"the guys in green, not black"* – confirming it was the Albany deputies – but this only further motivated Oneida's leadership to circle the wagons around their inter-agency partners.

270.    Immediately after the incident, Oneida County Sheriff's officials published a Facebook post praising the raid and stating, *"Thank you to Albany County Sheriff Craig Apple and the members of his Emergency Response Team for assisting… with a facility-wide sweep… [we] were able to conduct a thorough and effective sweep and get the facility back to normal operations quickly."* The post made no mention of any use of force or injuries. It projected the false impression that the operation was a routine success.

271.    Inside the jail, officers engaged in overt intimidation to deter incarcerated individuals from pursuing their grievances. In the days immediately following August 20, 2024, Oneida Officers Capra and Giambattista went through the housing units and issued a chilling warning to the incarcerated individuals: *"You better relax before we go get Albany County again."* The clear message was that if incarcerated individuals continued to complain or make trouble, the jail would bring back the same Albany CERT to inflict more punishment, more brutality, and more violence. This threat had its intended effect, as several incarcerated individuals withdrew or refrained from making further complaints.

272.    Following the incident, due to the sheer volume of complaints, the New York State Commission of Correction and the New York Attorney General's Office initiated inquiries. In response, Defendant Kinderman — the Oneida County Jail Administrator and final policymaker — submitted written statements filled with demonstrable falsehoods. In a January 29, 2025, letter to the Attorney General's Office in regard to one of the grievances from the raid, Kinderman falsely claimed that 'only minimal force was used,' that the incarcerated individual 'was not cuffed,' that the incident was a routine shakedown, and that body-camera footage proved incarcerated individuals were resisting when they were struck, or a single burst of OC spray was applied. He further asserted that detainees received prompt medical care and were fine. These statements were

not only inaccurate but designed to conceal the excessive use of force against Plaintiffs and other harmed detainees. Kinderman's responses served to legitimize, ratify, and effectively sugarcoat the officers' unlawful conduct, further demonstrating a pattern of institutional cover-up and a failure to hold staff accountable. Because Kinderman is a policymaking official for the County, this ratification establishes *Monell* liability.

273.    Contrary to Kinderman's attempt to distance himself from the events, he explicitly admitted in correspondence to the Attorney General that he observed a portion of the relevant events from a "discreet location," reviewed "all footage and reports," and ultimately ratified the officers' conduct—calling their actions "professional" and measured.

274.    After the raid, defendant Oneida and Albany County officers appeared at incarcerated individuals' cells whom they had assaulted as a method of intimidation. For example, while escorting another injured detainee back to his cell, defendant Albany officers deliberately stopped in front of Mr. Roberts's cell, mockingly smiled at him as he was visibly bleeding and injured, and said, "Welcome to Albany County," and laughed. While Mr. Roberts was being transported to Wynn Hospital, a defendant Oneida officer told him, "You shouldn't have said anything," indicating that filing grievances or speaking out against the inhumane violence and wanton cruelty of the raid not only fuels further violence, but evidently warrants it. Given Kinderman's proximity, rank, and direct involvement, it is implausible that this retaliatory intimidation occurred without his knowledge or tacit approval.

275.    Following the incident, Oneida officials stymied incarcerated individuals' attempts to obtain evidence of their abuse. For instance, Mr. Wright submitted a confidential request on August 23, 2024, to speak with an investigator, which was never fulfilled. Mr. Patterson submitted a grievance form on August 21, 2024, requesting to see medical staff and that pictures be taken of

all of his injuries. Photographs were never taken, and the grievance was ultimately denied. On August 22, 2024, Mr. Patterson filed another grievance form, which was also denied because the receiving officer did not sign or date the form, rendering the grievance invalid, and effectively silencing Mr. Patterson's complaint. Mr. Roberts also filed a grievance with OCCF on September 9, 2024, which was similarly denied. Other incarcerated individuals were also denied their requests to speak to investigators. Through these tactics—intimidation, retaliation, denial of medical documentation, and false reporting—Defendants conspired to obstruct any inquiry and to impede on incarcerated individuals' access to justice.

276.    As a final example of ratification: Oneida County's Sheriff and Chief openly congratulated the officers involved (via the Facebook post and internal praise), and no officer was disciplined. It was not until weeks later, under external pressure from the New York State Commission of Correction, that Oneida even attempted a perfunctory investigation, which (unsurprisingly) concluded by exonerating the officers. The entire episode thus reflects not a rogue occurrence, but a concerted policy or custom of permitting and then systematically covering up abuse at the highest levels of the Oneida and Albany County Sheriff's Offices.

**K.** ***Monell* Liability: Oneida County and Albany County's Policies and Customs of Excessive Force, Equal Protection Violations, and Retaliation Against Incarcerated Individuals Who File Grievances**

277.    The constitutional violations inflicted against Mr. Roberts, Mr. Wright, Mr. Patterson, and other victims of the August 20, 2024, raid were not isolated acts of rogue officers, but resulted directly from the policies, practices, and customs of Oneida County and Albany County. Both municipalities are therefore liable under *Monell* v. *Department of Social Services of New York*, 436 U.S. 658 (1978).

278.    A municipal entity can be held liable to a Plaintiff(s) if it can be established that a constitutional injury resulted from the implementation of "official municipal policy." *Lozman* v. *City of Riviera Beach*, 585 U.S. 87, 88 (2018).

279.    Pursuant to *Monell*, municipal liability exists only if "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Bd. of Cty. Comm'rs* v. *Brown*, 520 U.S. 397, 400 (1997) (*citing Monell*, 436 U.S. at 694).

280.    Thus, to establish municipal liability, a Plaintiff must establish that the municipality acted or failed to act in any one of three ways: First, the municipality adopted an official policy that deprives citizens of their constitutional rights. Second, the municipality tolerated or adopted an unofficial custom that results in the unlawful stripping of constitutional rights. Third, the municipality failed to train, supervise, or discipline its employees so as to prevent them from unlawfully depriving citizens of their constitutional rights. Here, all three conditions are met.

### 1. Official Policy, Including Ratification

281.    First, both Oneida County and Albany County adopted official municipal policies that deprived Plaintiffs and other incarcerated individuals of their constitutional rights.

282.    The raid was ordered, approved, overseen, and ratified by final policymakers— Chief Mark Kinderman for Oneida County and Sheriff Craig Apple for Albany County. These officials facilitated the involvement of Albany's CERT, known for its aggressive tactics, and, upon information and belief, instructed Oneida staff not to interfere during the raid. These directives constituted official policy and directly caused the constitutional violations.

283.    Following the operation, these same policymakers ratified the misconduct. Despite witnessing or immediately being made aware of the widespread and egregious use of excessive force throughout the facility, both Kinderman and Apple praised their respective officers. Oneida

County, through its official channels, issued public statements commending the raid—both on its Facebook page and the Oneida County Sheriff's Office website—thanking Albany County Sheriff Craig Apple and his CERT for their involvement in the "facility-wide sweep" and touting it as a success. *See Oneida County Sheriff's Office*, Facebook Post (Aug. 20, 2024), [https://www](https://www).facebook.com/story.php?story_fbid=895264669302868&id=100064580294118&rdid=ZLYiTGulOzrlJRZB; *Oneida County Sheriff's Office*, News Release (Aug. 21, 2024), [https://oneidacountysheriff.us/news/650ef96075a1fd61350ad7f5/](https://oneidacountysheriff.us/news/650ef96075a1fd61350ad7f5/) (last visited November 5, 2025). These public endorsements were published despite clear internal awareness of the injuries inflicted. The Facebook post received numerous comments from the families and friends of incarcerated individuals who described the operation as a "beatdown" and alleged serious physical harm to their loved ones. These celebratory and unrepentant public statements constitute formal ratification and endorsement at the highest levels of county leadership, creating an official policy sufficient to establish *Monell* liability.

284.    The coordinated and unchecked nature of the August 20, 2024, operation—carried out with foreknowledge of Albany CERT's reputation—was consistent with this official policy of violent suppression, willful blindness, and institutional denial of wrongdoing. The widespread use of unprovoked force, the absence of any discipline or investigation, and the coordinated effort to suppress grievances and falsify records—despite dozens of injured incarcerated individuals and dozens of filed complaints—demonstrate that unconstitutional behavior was not only tolerated but expected. Oneida and Albany Counties jointly carried out a premeditated operation that predictably and deliberately led to constitutional injuries.

285.    The conduct of both Counties reflects broader cultures of abuse, concealment, and retaliatory control within their jails, ratified and encouraged by the highest levels of decision-making authority.

286.    Kinderman was captured on video smirking as an incarcerated individual was assaulted during the raid was wheeled past him, visibly battered and disoriented. Kinderman's presence and expression signified not only awareness but also emotional investment in the raid's outcome.

287.    The official policy of Albany County, as further alleged in the Second Amended Complaint in *Washington v. City of New York*, No. 18 Civ. 12306 (S.D.N.Y. 2019), included the systematic use of a paramilitary "Green Team" to inflict beatings, sexual assaults, and prolonged solitary confinement on detainees transferred from Rikers Island. These actions were orchestrated and ratified by jail supervisors and Sheriff Apple, who were repeatedly placed on notice of these abuses and failed to intervene or discipline staff. *Washington v. City of New York*, No. 18 Civ. 12306 (S.D.N.Y. 2019), Second Am. Compl. ECF No. 112 ("*Washington* SAC").

### 2.    Unofficial Custom or Practice

288.    Oneida County and Albany County had unlawful municipal customs of permitting, tolerating, and enabling the use of excessive force, retaliation against incarcerated individuals who filed grievances, and the suppression or falsification of reports regarding custodial abuse. These customs included repeated failures to investigate or discipline officers known to use force improperly, a consistent refusal to take corrective action in response to widespread incarcerated individual complaints, and the open acceptance of aggressive tactics by outside agencies such as the Albany County CERT.

### a.    Defendants Albany County & Apple Oversee a "Green Team" Regime of Violence

289.     Allegations from *Washington* provide the clearest window into Albany's unofficial yet deeply entrenched custom of tolerating the use of excessive force by its staff, including CERT officers, under the leadership of Defendant Sheriff Craig Apple. *See Washington* SAC (all allegations are incorporated by reference herein).

290.     In that putative class action, six Rikers Island transferees—Davon Washington, Steven Espinal, John Doe, and Pariis Tillery, Richard Roe and David Doe—described the same scripted "intake ritual" at Albany County Jail. Lieutenant Anthony Torrisi led a masked Green Team of CERT officers that: (i) forced the shackled prisoners to follow contradictory strip-search commands, (ii) beat and kicked them for inevitable "non-compliance," (iii) pepper-sprayed or tased them, (iv) digitally penetrated their rectum or threatened genital shocks, and (v) consigned them to 4-East SHU on a fabricated "assault on staff" ticket.

291.     **Davon Washington (22 years old, transferred to Albany County Jail March 28, 2018):** Upon arrival at the Albany County Jail, Washington was handcuffed and shackled, taken to Booking Cell # 2, where he was smacked in the face multiple times by Defendant Torrisi for not knowing why he was there and in response to questions about gang affiliation. *Washington* SAC ¶¶ 149-150. He was strip-searched, punched all over his body, kicked, and stomped on while curled in the fetal position. *Id*. ¶¶ 152, 154-158. After he mentioned a bullet fragment in his foot, defendants stomped directly on his foot, causing extreme pain. *Id*. ¶ 160. Officers instructed him to spread his buttocks and cough; upon claiming to see plastic (contraband) in his rectum, they continued to beat him while naked, pushed him to the floor, and one defendant forcefully inserted two fingers into his rectum while mocking him by saying, "He pushed it back up." *Id*. ¶¶ 161-163. As a result of these assaults, he suffered bleeding from his nose and mouth, a swollen face, chipped tooth, split lip, pain in his foot, bruises all over his back and body, and continued pain, emotional

distress, and traumatic thoughts for many days afterward. *Id*. ¶¶ 165, 173, 179. He was sentenced to 360 days in solitary confinement after a sham disciplinary hearing. *Id*. ¶¶ 174-178.

292.    **Steven Espinal (19 years old, transferred to Albany County Jail February 13, 2018):** Upon arrival at the Albany County Jail, Espinal was cuffed and shackled and taken to a cell, where he was punched in the face by Defendant Torrisi and beaten by multiple officers in the booking cell. *Id*. ¶¶ 228-233, 235. He was strip-searched, kicked, stomped on, and punched in the ribs while curled on the ground in the fetal position. *Id*. ¶¶ 234-235, 238. An x-ray allegedly showed contraband in his rectum, leading to another assault where officers punched and kicked him, digitally penetrated his rectum with gloved fingers, forced him to attempt to defecate on the floor while naked and bleeding, and tased him in the back while he stood against the wall. *Id*. ¶¶ 243, 248-252, 255-256. He was then placed in a restraint chair overnight, where officers slapped and smacked him in the face while taunting him. *Id*. ¶¶ 258-261. He suffered facial bleeding, bruises all over his body, rectal bleeding, blood in his urine, dizziness, temporary hearing loss, and required catheterization at Albany Medical Center. *Id*. ¶¶ 251, 263-264. He was sentenced to 600 days in solitary confinement after a sham disciplinary hearing and remained there in violation of a court order for his release from punitive segregation, which was ignored by Apple and his staff. *Id*. ¶¶ 273-278.

293.    **John Doe (24 years old, transferred to Albany County Jail January 24, 2018):** Upon arrival at the Albany County Jail, John Doe was subjected to a brutal assault by Albany CERT officers (Green Team) who beat him severely, including punches and kicks to his body and head. *Id*. ¶¶ 331-370. Officers inserted their fingers into his rectum multiple times while demanding he expel alleged contraband and sodomized him with a baton. *Id*. ¶¶ 331-370. He was tased four times during the assault, causing him to involuntarily urinate and defecate on himself

multiple times, and leading to loss of consciousness. *Id*. ¶¶ 331-370. After the assault, he was denied adequate medical attention and forced to sleep in a cell covered in his own urine and feces. *Id*. ¶¶ 372-379. He suffered injuries including swelling and bruising to his face, pain in his ribs and chest, and rectal bleeding that persisted for weeks. *Id*. ¶¶ 377-379. He was sentenced to 550 days in solitary confinement following a sham disciplinary hearing. *Id*. ¶ 387.

294. **Pariis Tillery (25 years old, transferred to Albany County Jail August 9, 2018):** Upon arrival at the Albany County Jail, Tillery was moved into Booking Cell #2 where his handcuffs were removed, and about eight to ten Albany County Jail correction officers and supervisors were waiting. *Id*. ¶¶ 418-419. When asked if he knew where he was and responding "no," he was punched in the face, leading to a beating by eight or nine officers who punched, kicked, and stomped on him for approximately 10 minutes after he fell to the floor. *Id*. ¶¶ 421, 423-424. During a strip-search, officers brandished a taser at him, called him a "monkey," and then hit, punched, and kicked him multiple times for a significant period. *Id*. ¶¶ 432-433. After a three-day delay in medical care, he was taken to Albany Memorial Hospital, where medical records documented trauma to his head, blood in his ear, ecchymosis to orbits, and requested ruling out skull fracture and cranial trauma; he was diagnosed with tympanic membrane perforation (ruptured eardrum), head injury, and concussion, receiving antibiotics and multiple CT scans. *Id*. ¶¶ 437-442. He received a false infraction ticket on August 9, 2018, for assaulting staff, and at a sham disciplinary hearing on August 24, 2018, with no preparation, witnesses, testimony, or recording, he was sentenced to 300 days in solitary confinement. *Id*. ¶¶ 454-457.

295. **Richard Roe (24 years old, transferred to Albany County Jail January 24, 2018):** Richard Roe, a then-24-year-old African-American detainee, arrived at the Albany County Jail from Ulster County along with *Washington* Plaintiff John Doe. *Id*. ¶ 470. Albany County Jail

officers, under the direction of Defendant Torrisi, beat Richard Roe in his assigned cell in 4 East. *Id*. ¶ 471. Richard Roe was later sentenced to 450 days in solitary confinement. *Id*. ¶ 472. Official reports from the Albany County Jail falsely claim that officers had to use force defensively after the detainee "turned off the wall," stating that after a positive x-ray for contraband, the incarcerated individual was placed on the wall in his cell and ordered to remove the object, turned off the wall 2 times, and was taken to the floor. *Id*. ¶ 473.

296.    **David Doe (18 years old, transferred to Albany County Jail January 24, 2018):** David Doe arrived at the Albany County Jail from Rikers on January 24, 2018. *Id*. ¶ 475. Albany County Jail officers, under the direction of Defendant Torrisi, repeatedly punched David Doe in his face and body in a booking cell when he was unable to follow commands to remove his clothing in a specific way. *Id*. ¶ 476. After officers claimed to have seen an object in his rectum on an x-ray, the officers took David Doe to Cell #16 in 4 East, where they continued to beat David Doe until they claimed that the object had been removed. *Id*. ¶ 477.

297.    After the incidents detailed in the *Washington* case, Apple was notified via grievances and the New York State Commission of Correction. Apple nonetheless praised the Green Team publicly and kept every officer on duty.

298.    Many of the same Albany County officers who carried out the August 20, 2024 raid on the Oneida County Correctional Facility were also named as defendants in *Washington v. City of New York*, including **Captain Frank Harris, Lieutenant Anthony Torrisi, Lieutenant Mark Valvo, Lieutenant Ryan Lawson, Lieutenant Anthony Coppolo, Correction Officer Josiah Haley, Correction Officer Michael Beliveau, Sergeant Joseph Kelly, Correction Officer Thuan Ton, and Correction Officer Jarred Jarosz**. *Washington* alleged that these same officers participated in a pattern of assaults, retaliatory confinement, and cover-ups at the Albany County

Correctional Facility. The *Washington* defendants later settled that case for approximately **$1 million**, yet Sheriff Apple continued to deploy these same officers in high-risk CERT operations—demonstrating actual notice, deliberate indifference, and ratification of the unconstitutional practices challenged here.

### b. Related Action: *Cepeda v. City of New York*, et al. — Green Team Torture of Rikers Transferees

299.     The official policy of Albany County, as further alleged in *Cepeda v. City of New York*, No. 20-cv-3483 (S.D.N.Y. 2020), continued the same paramilitary "Green Team" regime identified in *Washington v. City of New York*, systematizing the use of beatings, sexual assaults, sham disciplinary hearings, and prolonged solitary confinement against detainees transferred from Rikers Island. *Cepeda Compl.* ¶¶ 72–77, 587–596. These actions were directed by Lieutenant Anthony Torrisi and ratified by Sheriff Craig Apple and Jail Superintendent Michael Lyons, who had long been on notice of the Green Team's abuses and failed to discipline its members.

300.     In *Cepeda*, plaintiffs Julian Cepeda, Willie Murray, Jeffery Simon, Samson Walston, Evan Zachary, and Nazeem Francis described a coordinated pattern of assaults carried out by a masked team of Albany County Correctional Emergency Response Team (CERT) officers known as the "Green Team." *Id.* ¶¶ 10–20, 72–94. Each plaintiff alleged that upon arrival at the Albany County Correctional Facility (ACCF) from Rikers Island, they were forced into an identical "intake ritual": stripped naked, ordered to perform contradictory movements, and then beaten, pepper-sprayed, tased, and digitally penetrated while officers shouted, "This isn't Rikers. This is Albany County. We do what we want here." *Id.* ¶ 121.

301.     Plaintiff Cepeda (20 years old, transferred January 24, 2018) alleged that Torrisi personally ordered and joined in his beating, during which multiple Green Team officers punched, kicked, and stomped him, digitally penetrated his rectum, and mocked him. *Id.* ¶¶ 237-252, 587–

595. Cepeda alleged that Torrisi stated to him before the beating that, "*This is not Rikers Island. If you're gonna act like an animal here we're gonna beat the fuck out of you Nigger.*" Id. ¶ 239. Cepeda suffered facial and body trauma, rectal bleeding, and emotional distress, then was placed in solitary confinement for hundreds of days following a sham disciplinary hearing. *Id.* ¶¶ 253-255.

302.    The complaint alleged the other plaintiffs were put through nearly identical procedures upon intake, subjected to the same racialized brutal beatings, repeatedly threatened, repeatedly sexually assaulted, and repeatedly called "nigger" and other racial slurs. *See id.* ¶¶ 256-409.

303.    The complaint alleged that these assaults were not isolated but the product of Albany County's official policy and custom "of subjecting transfer detainees from New York City who were perceived to be dangerous or difficult to excessive force, including sexual assault." *Id.* ¶¶ 588, 595. Sheriff Apple and Superintendent Lyons were repeatedly alleged to have created, condoned, and perpetuated that policy, knowing of prior similar incidents and failing to intervene. *Id.* ¶¶ 589–590, 625–629.

304.    The *Cepeda* pleading further tied Albany County's conduct to its financial motive to accept Rikers transferees at $175 per day per detainee, as well as to public reports by *The New York Times* documenting the same abuse pattern. *Id.* ¶¶ 70–72, 106. It alleged that Apple and Lyons continued to deploy Torrisi, Valvo, Coppolo, and other Green Team officers long after the *Washington* case had exposed identical conduct, demonstrating deliberate indifference and ratification at the highest supervisory levels.

305.    The *Cepeda* plaintiffs also asserted that the City of New York maintained an unlawful policy of transferring detainees to Albany County "with the knowledge and expectation

that they would be subjected to excessive and unlawful force there," thereby rendering both municipalities jointly responsible for the continuing Green Team regime. *Id.* ¶ 591.

306.    Many of the same officers named in *Washington*—including Torrisi, Valvo, Coppolo, Haley, and Lawson—were again identified in *Cepeda* as perpetrators of coordinated assaults and sexual abuse against Rikers transferees. The recurrence of the same actors and methods across both lawsuits, spanning 2018–2019, confirms that Sheriff Apple and Albany County operated under actual notice of an entrenched pattern of unconstitutional force, yet chose to preserve and profit from it.

### c.    Other Recent Civil Actions Corroborate Albany's Custom of Enabling the "Green Team" Regime of Violence

307.    Several other incidents and cases corroborate Albany County's widespread custom of subjecting incarcerated individuals to violence and torture by the "Green Team" of CERT officers at Albany County Jail. The allegations made in these cases are identified and described below.

308.    ***Carpenter v. Albany County Corr. Facility*, No. 25 Civ. 14 (N.D.N.Y. 2025):** Plaintiff Erik Carpenter was brutally sexually assaulted during a CERT shakedown where officers stomped on his genitals. Supervisors were present but did not intervene, and grievances were ignored. *Carpenter v. Albany Co. Corr. Facility*, Compl. ECF No. 1, ¶¶ 24-29.

309.    ***Carpenter v. Apple*, No. 15 Civ. 1269 (N.D.N.Y. 2017):** Plaintiff Gina Carpenter, a female detainee at Albany County Jail, was raped by deputies. Supervisors mocked her complaints. The complaint details a pattern of sexual abuse, retaliation, and deliberate indifference by Apple and command staff. *Carpenter v. Apple*, Compl., ECF No. 1, ¶ 30.

310.    ***Hyman v. Albany County*, No. 13 Civ. 770 (N.D.N.Y. 2016):** Plaintiff Winston Hyman was subjected to two separate beatings by CERT officers. Supervisors and Apple were

notified but took no action. *Hyman v. Albany Co.*, Am. Compl., ECF No. 64, ¶¶ 32, 48, 143, 170-171.

311.    ***Haggray v. Albany County*, No. 16 Civ. 32 (N.D.N.Y. 2016):** Plaintiff Nyjew Haggray was Tased and beaten while handcuffed. *Haggray v. Albany Co.*, Compl., ECF No. 1, ¶ 28.

312.    ***Moore v. Albany County*, No. 19 Civ. 630 (N.D.N.Y. 2022):** Plaintiff Paul Moore was violently strip searched, pepper sprayed, and beaten while handcuffed. The court noted prior excessive force complaints against the same deputy, yet no corrective action was taken. Moore v. Albany Co., Compl., ECF No. 1, ¶¶ 20-53.

313.    ***Allah v. Albany County Correctional Facility*, No. 9:23-cv-785 (N.D.N.Y. 2023):** In *Allah*, the plaintiff, an incarcerated individual at the Albany County Correctional Facility, alleged that Lieutenants Anthony Torrisi, Ryan Lawson, and Anthony Coppolo, together with Sergeants Michael Bonacci and Joseph Aragona and several Correction Officers including Thomas Pleat, conspired to retaliate against him for filing grievances by fabricating disciplinary tickets, conducting a racially motivated strip search, and brutally assaulting him on May 20–21, 2023, while he was restrained. The complaint alleged violations of the First, Fourth, Eighth, and Fourteenth Amendments and detailed systemic retaliation, excessive force, and falsification of reports by ACCF staff—consistent with the widespread pattern of inmate abuse and cover-ups at the facility that underlie Plaintiffs' Monell claims here.

314.    ***Farrington v. Poole*, No. 9:22-cv-356 (N.D.N.Y. 2024):** In *Farrington*, the Plaintiff Danny Farrington alleged that Sergeant Michael Poole, along with Albany County Correctional Officers Josiah Haley, Andrew Cohen, Padraic Lyman, Erik Gettings, Vincent Livreri, and David Dollard, violently him inside the Albany County Correctional Facility on May

21, 2020, after he verbally complained about unjust treatment. The complaint alleged that Poole and others slammed Mr. Farrington to the ground, repeatedly punched and kicked him, and sprayed chemical agents directly into his face at close range, causing head trauma and brain injury. The officers then filed a knowingly false disciplinary report to justify the assault. The suit alleged violations of the First, Eighth, and Fourteenth Amendments and remains pending before the Northern District of New York. These allegations mirror the unconstitutional tactics at issue here—collective beatings of restrained detainees, fabrication of incident reports, and the absence of any disciplinary action by Sheriff Apple or his command staff despite clear notice of officer misconduct. Joseph Haley and Vincent Livreri are named as defendants in the *Farrington* case and this case.

315.    ***Anderson v. Coppolo*, No. 25-cv-794 (N.D.N.Y. 2025):** In *Anderson*, the plaintiff alleged that Albany County Correctional Lieutenant Anthony Coppolo and several subordinates used excessive force against him at the Albany County Jail, including punching and kneeing him while he was handcuffed and compliant, causing him to lose consciousness. Plaintiff further alleged that an officer sexually assaulted him by inserting his finger in Plaintiff's rectum. When the plaintiff objected to the anal penetration, the officers yelled "stop resisting" and then proceeded to brutally assault him again. The complaint further alleged a deliberate effort to conceal the beating through falsified reports and omitted video footage, all ratified by command-level officers including Sheriff Craig Apple and Superintendent Michael Lyons. The case demonstrates that senior officials in the Albany County Sheriff's Office were repeatedly placed on notice of violent misconduct by CERT supervisors such as Defendant Coppolo yet failed to impose corrective discipline or retraining.

316.    Extensive media coverage in late 2023 reported multiple lawsuits filed under New York's Adult Survivors Act alleging that correction officers at Albany County Jail raped and sexually abused women in custody—sometimes resulting in pregnancies and coerced abortions. The lawsuits and press accounts emphasized that these were not isolated acts by individual officers but reflected systemic failures by jail leadership to prevent, detect, or respond to custodial sexual abuse. This public record of repeated and unchecked misconduct underscores a longstanding policy or custom of supervisory indifference at Albany County Jail, placing detainees at ongoing risk of serious harm. *See* Raga Justin, *Woman Alleges She Was Raped at Albany County Jail*, Times Union (N.Y.), Nov. 9, 2023, https://www.timesunion.com/state/article/woman-alleges -raped-albany-county-jail-18480487.php; Raga Justin, *Lawsuits Allege Sexual Assault by Albany, Rensselaer Jail Officers*, Times Union (N.Y.), Oct. 27, 2023, https://www.timesunion.com/state/article/lawsuits-allege-sex-assaults-albany-rensselaer -18447650.php; Skylar Eagle, *Two Women Sue Albany County Jail Over Alleged Rape, Sexual Abuse*, NewsChannel 10 (Albany), Nov. 13, 2023, https://www.news10.com/news/albany- county/two-women-sue-albany-county-jail-over-alleged-rape-sexual-abuse.

317.    Collectively, these lawsuits corroborate a well-settled custom in Albany County of Green Team ambushes, Taser abuse, sexual assault, sham infractions, and prolonged solitary confinement, all ratified by supervisory inaction and a systemic failure to train, supervise, or discipline staff.

318.    The misconduct of Green Team officers continued unchecked even after multiple lawsuits and settlements had placed Albany County and Sheriff Apple on clear notice of pervasive corruption and dishonesty within the ranks. For example, on or about June 24, 2020, Defendant Albany County Correction Officer Ryan Lawson—one of the officers named in *Washington* and

*Cepeda*—was arrested and charged with falsely reporting an incident, after claiming that an unknown person threw a lit firework into his home. Investigators determined the firework had been lit inside by a family member and that Lawson had fabricated the attack. Despite the seriousness of this conduct, which publicly embarrassed the Sheriff's Office, Apple retained Lawson and continued to deploy him in CERT operations, further demonstrating deliberate indifference to officer misconduct and a policy of protecting violent and dishonest subordinates. See Spectrum Local News, *Albany County Sheriff's Office Employee Arrested After Falsely Reporting Firework Attack* (June 29, 2020).

319.    Defendant Apple has had personal notice of each of the foregoing incidents through lawsuits, Notices of Claim, media coverage, and internal grievance logs. Yet, he has failed to implement any meaningful discipline upon CERT members. For example, Defendant Torrisi has remained on duty and led subsequent intakes and raids, like the one described in this Complaint.

320.    Defendants Apple and Albany County have also failed to retrain or monitor staff in light of these repeated constitutional violations, as evidenced by their repetition. The numerous sexual assault lawsuits against Officer Roberson, combined with Green Team assaults involving sexual assault, establish a culture where sexual abuse is met with impunity.

### d. Oneida County's Custom and Pattern of Excessive Force, Retaliation, and Grievance Suppression

321.    Several recent cases at OCCF and Marcy Correctional Facility (where Kinderman previously held a leadership role) illustrate a custom and pattern of excessive force, retaliation, and grievance suppression perpetrated and ratified by Oneida County and Kinderman.

322.    ***Burell v. Kinderman*, No. 25 Civ. 535 (N.D.N.Y. 2025):** Plaintiff Burell, an incarcerated person at Oneida County Jail, alleged that Kinderman repeatedly threatened him and retaliated against him because of lawsuits he had filed against officers at Midstate Correctional

Facility, where Kinderman previously worked in a leadership role. Burell alleges that he was denied the right to make legal calls, threatened regarding lawsuits he had filed against officers at Midstate Correctional Facility, denied the right to file grievances, denied medical care, and denied other basic services like the right to shower and attend recreation. *Burell v. Kinderman*, Compl., ECF No. 1 ¶¶ 49-50, 74-75.

323.   ***Smith v. Oneida County Jail*, No. 24 Civ. 749 (N.D.N.Y. 2025):** Plaintiff Wayne R. Smith was subjected to excessive force by officers at the Oneida County Jail, including beatings. After he filed grievances, he was retaliated against with disciplinary sanctions and transfers. The complaint alleges that supervisors, were aware but failed to act or discipline involved officers. *Smith v. Oneida Co. Jail*, 2d Am. Compl., ECF No. 43 at 6-7.

324.   ***Mercer v. Kinderman et al.*, No. 20 Civ. 665 (N.D.N.Y. 2021):** Plaintiff James R. Mercer, Jr., formerly incarcerated at Marcy Correctional Facility, alleges that after filing grievances for denial of medical care and accommodations for his disabilities, he was subjected to retaliatory discipline including threats, involuntary program changes conflicting with medical restrictions, and keeplock confinement. Compl., ECF No. 1 ¶¶ 17, 25, 27, 34, 42, 54, 65, 74, 82, 96, 99, 104, 128, 129, 136, 147, 160. The complaint details a pattern of staff abuse through repeated denials, interferences, and failures to intervene or investigate. *Id.* ¶¶ 21, 29, 41-42, 49, 57, 59, 63, 119, 140, 142, 147, 160, 182-183, 191-192, 194-196. Kinderman was directly involved in grievance hearings, providing testimony and making decisions denying accommodations and program adjustments. *Id.* ¶¶ 21, 29, 42, 49, 57, 59, 182-183, 192, 194-196. Systemic denial of procedural rights is alleged through non-filing, non-hearing, delays, and improper processing of grievances and requests for reasonable accommodations. *Id.* ¶¶ 17, 25, 27, 34, 42, 54, 65, 74, 82, 96, 99, 104, 128, 129, 136, 147, 160, 182-183, 191-192, 194-196.

325.     Across these cases, plaintiffs consistently allege that Oneida County staff, under Kinderman's supervision, retaliated against incarcerated individuals who filed grievances or complaints about staff misconduct. This retaliation included disciplinary tickets, transfers, and solitary confinement. Grievances were routinely ignored, and no meaningful investigations were conducted.

326.     In each case, despite repeated notice to Kinderman and other supervisors—through grievances, internal reports, and lawsuits—no officer was disciplined or retrained. Instead, staff known for excessive force were allowed to continue working without consequence, and in some cases, were promoted or given more responsibility.

327.     **Correctional Association of New York ("CANY") 2023 Report on Marcy Correctional Facility**: The report, based on a monitoring visit conducted on October 11 and 12, 2022, details allegations of rampant staff abuse, physical assaults, a retaliatory environment, unfair disciplinary processes, and issues with the grievance system at Marcy Correctional Facility. Corr. Ass'n of N.Y., CANY Releases Report on Marcy Correctional Facility (2023), https://www .correctionalassociation.org/news/cany-releases-report-on-marcy-correctional-facility.

328.     The pattern of excessive force, retaliatory discipline, and due process violations under Kinderman's leadership at Marcy Correctional Facility is well-documented in *Mercer* and in the CANY 2023 Report on Marcy Correctional Facility. These same customs and practices were carried over to Oneida County Jail, further establishing a longstanding and widespread custom of unconstitutional conduct.

329.     In several of the cases cited above, plaintiffs allege that officers, with the knowledge and approval of Kinderman, routinely falsified use-of-force reports and suppressed

evidence of abuse. Medical staff were pressured to underreport injuries, and internal investigations were perfunctory or non-existent.

330. Oneida County failed to provide adequate training on the use of force, grievance procedures, and the duty to intervene. Supervisors, including Kinderman, failed to supervise or discipline staff, reflecting deliberate indifference to the risk of constitutional violations.

331. The consistent allegations across multiple lawsuits—spanning excessive force, retaliation, suppression of grievances, and failure to discipline—demonstrate a well-settled custom and practice within Oneida County Jail, ratified and perpetuated by Kinderman. These customs were a moving force behind the constitutional violations suffered by Plaintiffs and are sufficient to establish *Monell* liability.

### e. Both Oneida County and Albany County Have Enabled Brutality and Abuse Through a Culture of Impunity

332. Both Oneida County and Albany County have allowed officers to operate without functioning body-worn cameras, failed to enforce reporting requirements for use-of-force incidents, and ignored known risks of deploying an external CERT unit with a reputation for brutality. These customs were reinforced through tacit approvals, repeated omissions, and long-standing institutional cultures in which correctional staff were shielded from accountability.

333. As alleged in this Complaint and in the civil litigation, oversight reports, and media investigations incorporated herein, such customs were deeply embedded within the operational fabric of both counties and were a moving force behind the constitutional violations committed against Plaintiffs. They were evidenced by the recurring failure to discipline officers known to have used excessive force, the regular suppression or non-investigation of incarcerated individual grievances, and a pattern of permitting visiting law enforcement officers, including CERT members, to operate without oversight.

334.    At Oneida County Jail and Albany County Jail, incarcerated individuals who lodged complaints were routinely retaliated against through disciplinary sanctions or transfers. Prior civil rights complaints, grievances, and public allegations placed both Counties on notice of the pattern of excessive force and retaliation. Despite this, senior officials, including Kinderman and Apple, continued to authorize and ratify tactics and procedures that predictably resulted in harm.

335.    The historical record at Oneida County Jail, Albany County Jail, and Marcy Correctional Facility (where Defendant Kinderman previously held leadership) is rife with documented incidents of excessive force, retaliation, and procedural abuse. These patterns establish a deeply entrenched culture that operated as an unofficial policy or custom with the force of law. *See, e.g., Brooks v. Farina,* No. 9:25-cv-00068-AMN-ML (N.D.N.Y. filed Jan. 15, 2025); *Smith v. Oneida County Jail et al*, No. 24 Civ. 749 (N.D.N.Y. filed June 6, 2024); Matthew Benninger, Nicole LaFiandra & Rachel Culver, 9 Guards Charged in Fatal Beating of Inmate at CNY Prison, CNY Central (Feb. 20, 2025), https://cnycentral.com/news/local/fatal-beating-leads-to-murder-manslaughter-charges-for-marcy-correctional-officers-governor-kathy-hochul-facility-robert-brooks-inmate]; Correctional Ass'n of N.Y., Marcy Correctional Facility: 2023 Monitoring Report 6–8 (2023); Raga Justin, Lawsuits Allege Sex Assaults by Albany, Rensselaer Jail Officers, Times Union (Oct. 27, 2023), https://www.timesunion.com/state/article/lawsuits-allege-sex-assaults-albany-rensselaer-18447650.php; *Read v. Calabrese*, No. 11 CV 459 (N.D.N.Y. 2015) No. 19 Civ. 318 (N.D.N.Y. filed Mar. 12, 2019); *Washington v. City of New York*, No. 18 Civ. 12306 (S.D.N.Y. 2019).

336.    Plaintiffs incorporate by reference all allegations in the above pleadings, oversight reports, and media investigations supporting the existence of such a custom, including the prior

incidents, failure to investigate, suppression of incarcerated individual complaints, and ratification of the raid through official channels.

### 3. Failure to Train and Supervise

337.    Both Oneida County and Albany County failed to train and supervise their officers adequately. Oneida County had no appropriate protocol for inter-agency operations and failed to instruct its personnel to intervene or report misconduct by visiting officers. Albany County permitted its CERT to function with impunity when deployed externally.

338.    Officers were not required to wear functioning body-worn cameras or to file appropriate use-of-force reports. These omissions reflect deliberate indifference and a systemic failure of oversight that contributed directly to Plaintiff's injuries.

339.    Even if this were a single coordinated event, the scale and severity—dozens of victims, multiple facilities, and two participating counties—would demonstrate that the Counties' leadership knew, or deliberately ignored, the predictable outcome. Treating the incident as a success rather than an aberration reflects an institutional custom of unconstitutional conduct and establishes municipal liability under settled case law. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

340.    On information and belief, Albany's CERT has a history of excessive force, and its members acknowledged this pattern of brutality when they stated, "this is how Albany gets down." Oneida County's policymakers were aware of the CERT's reputation yet proceeded with their invitation, making them complicit.

341.    The conduct of both Counties reflects a broader culture of abuse, concealment, and retaliatory control within their jails, ratified and encouraged by the highest levels of decision-making authority.

342.    Chief Kinderman was captured on video smirking as Brandon McNair was wheeled past him, visibly battered and disoriented. On information and belief, Kinderman also gave his tacit approval or express authorization as officers attempted to re-enter Mr. McNair's infirmary cell in a calculated act of retaliation.

343.    Months later, Kinderman submitted a letter to the Attorney General's Office (dated Jan. 29, 2025) that deliberately misrepresented the incident, falsely claiming that one incarcerated individual, Brandon McNair was not cuffed, that only minimal force was used, and that the pepper spray deployment was justified.

344.    Jail staff were instructed not to interfere with the raid. Numerous grievances and complaints were filed after the incident internally with the Oneida County jail and with external oversight agencies—many from incarcerated individuals requiring medical treatment, including stitches—yet no officer was disciplined or retrained. This reflects not only policy failure but deliberate suppression of incarcerated individual redress.

345.    Officer Pease was reported to have said, "this is a lawsuit and it's definitely wrong," yet the concerns of Plaintiffs and the other incarcerated individuals were ignored. Medical staff were pressured to underreport injuries. Plaintiffs all suffered from delayed and insufficient access to medical care following the incident.

346.    Both Counties orchestrated the use of Albany CERT in Oneida facilities as a tactical maneuver designed to minimize liability by creating plausible deniability. This arrangement placed unaccountable officers in positions of unchecked power over incarcerated individuals with whom they had no relationship or oversight.

347.    Oneida and Albany Counties failed to train, supervise, or discipline involved officers, and instead ratified their conduct through silence, internal messaging, and written communications.

348.    This is a paradigmatic case of *Monell* liability. These were not "bad apples" acting independently, but agents of a culture fostered and protected by the Counties' leadership.

349.    Albany County's failure to comply with FOIL obligations, including its constructive denial of relevant records, further demonstrates systemic efforts to suppress evidence and avoid accountability.

350.    The victims in this case were all polite, compliant, and respectful detainees. Yet, all three of them were subjected to systemic brutality and institutional neglect.

## VII.    CLAIMS FOR RELIEF

**FIRST CAUSE OF ACTION:**
**Excessive Force, 42 U.S.C. § 1983 – Eighth and Fourteenth Amendments**
**(Plaintiffs Claudio, Gosier, Johnson, and Leslie [Detained Pretrial – Fourteenth**
**Amendment] and Plaintiffs Patterson, Roberts, and Wright [Incarcerated Pursuant to**
**Sentence – Eighth Amendment]**
**Against Defendants County of Oneida; County of Albany; Maciol; Kinderman; Apple;**
**Paternoster; Smith; Chapman; Holbert; Spielmann; Hozanovic; Pease; Corcoran; Torrisi;**
**Valvo; Lawson; Coppolo; Bonacci; Kelly; Haley; Ton; Legault; Pleat; Gibbons; Poulin;**
**Jarosz; Wright; Almindo; Barlett; Livreri; Ali; Hart; Albany County Officers A, B, G, T,**
**and S; and John Doe Oneida County SERT Officers #1-20)**

351.    All preceding and subsequent paragraphs are incorporated by reference.

352.    On or about August 20, 2024, the aforementioned Defendants used objectively unreasonable force against Plaintiffs and/or failed to prevent others from doing so despite being aware of the use of objectively unreasonable force and having a reasonable opportunity to intervene to prevent it.

353.    Defendant Oneida County caused the violation of Plaintiffs' rights because it has a policy and custom—directed and ratified by its final policymakers—of inviting Albany County

CERT to OCCF with the knowledge and expectation that they would subject the incarcerated individuals to excessive and unlawful force.

354.    Defendant Albany County caused the violation of Plaintiffs' rights because it has a policy or custom—directed and ratified by its final policymakers—of permitting its CERT to subject incarcerated individuals to physical violence and excessive force.

355.    The conduct of the aforementioned Defendants in violently assaulting Plaintiffs without need or provocation violated their right to be free from excessive force.

356.    No legitimate governmental objective justified the level of force used; it was applied maliciously and sadistically to cause harm.

357.    The aforementioned Defendants' actions were objectively unreasonable under clearly established law.

358.    As a result of the aforementioned Defendants' unlawful conduct, Plaintiffs suffered the injuries hereinbefore alleged.

**SECOND CAUSE OF ACTION:**
**Conspiracy to Violate Civil Rights, 42 U.S.C. § 1985(3) –**
**Fourteenth Amendment**
**(All Plaintiffs Against Defendants Maciol; Kinderman; Apple; Paternoster; Smith; Chapman; Holbert; Spielmann; Hozanovic; Pease; Corcoran; Torrisi; Valvo; Lawson; Coppolo; Bonacci; Kelly; Haley; Ton; Legault; Pleat; Gibbons; Poulin; Jarosz; Wright; Almindo; Barlett; Livreri; Ali; Hart; Albany County Officers A, B, G, T, and S; and John Doe Oneida County SERT Officers #1-20)**

359.    All preceding and subsequent paragraphs are incorporated by reference.

360.    The aforementioned Defendants, in their individual capacities, acting in concert and motivated by racial bias, conspired to deprive Plaintiffs and other non-white incarcerated individuals of the equal protection of the laws and equal privileges and immunities under the law.

361.    The aim of the conspiracy was to punish and terrorize the Black and Latino incarcerated individuals through excessive force and then to cover it up, while sparing white incarcerated individuals.

362.    Overt acts in furtherance of this conspiracy include planning the raid to "show how it's done" (with the understanding that minority incarcerated individuals would be taught a "lesson"); using slurs or racially charged language like "you guys," directed at the minority population; disproportionately brutalizing non-white incarcerated individuals; and jointly concealing the misconduct afterward.

363.    This conduct was driven by invidious discriminatory animus—a desire to subjugate a class of persons (non-white incarcerated individuals/detainees)—and it resulted in the violation of Plaintiffs' rights.

364.    As a result of Defendants' unlawful conduct, Plaintiffs suffered the damages hereinbefore alleged.

### THIRD CAUSE OF ACTION:
**Neglect to Prevent Conspiracy, 42 U.S.C. § 1986**
**(All Plaintiffs Against Defendants Kinderman, Maciol, Apple, Paternoster and any supervisory John Doe Oneida County SERT Officers)**

365.    All preceding and subsequent paragraphs are incorporated by reference.

366.    Numerous Oneida County and Albany County employees—including but not limited to the aforementioned Defendants, and officers within the medical and administrative chain of command—had actual or constructive knowledge of the conspiracy to deprive Plaintiffs and other non-white incarcerated individuals of the equal protection of the laws and equal privileges and immunities under the law through the coordinate the coordinated abuse and planned cover-up of the August 20, 2024, assault at OCCF.

367.    Defendants either personally witnessed the planning of the August 20, 2024, raid designed to target Black and Latino incarcerated individuals at OCCF (including all Plaintiffs), or later reviewed clear evidence of constitutional violations, including the excessive force, false reporting, medical neglect, and intimidation, as state actors conspired to suppress incarcerated individuals' ability to report the abuse and/or receive appropriate medical treatment or escalation of care.

368.    Defendants also had the power and authority to intervene or aid in preventing the conspiracy, including by preventing the transfer of Albany County CERT members to OCCF on August 20, 2024, and/or by investigating, documenting, or escalating the complaints of Plaintiffs and other incarcerated individuals.

369.    Despite having knowledge of the conspiracy and the power to prevent it, Defendants neglected or refused to do so. Instead, they either watched or participated and covered it up.

370.    As a result of Defendants' unlawful conduct, Plaintiffs suffered the damages hereinbefore alleged.

**FOURTH CAUSE OF ACTION:**
**Deliberate Indifference to Serious Medical Needs, 42 U.S.C. § 1983 – Eighth and Fourteenth Amendments**
**(Plaintiffs Claudio, Gosier, Johnson, and Leslie [Detained Pretrial – Fourteenth Amendment] and Plaintiffs Patterson, Roberts, and Wright [Incarcerated Pursuant to Sentence – Eighth Amendment] Against Defendants Oneida County, Kinderman, Paternoster, Corcoran, and Jones)**

371.    All preceding and subsequent paragraphs are incorporated by reference.

372.    After the assault on August 20, 2024, the aforementioned Plaintiffs had serious visible injuries that required immediate attention. In the weeks following the assault, Plaintiffs developed significant psychological conditions requiring medications.

373. Plaintiffs did not receive adequate or reasonable medical care after the August 20, 2024, assault.

374. Medical staff were aware of the serious injuries inflicted upon Plaintiffs and denied them medical care and/or failed to get medical care for them.

375. Defendant Oneida County caused the violation of Plaintiffs' rights because it has an official policy or custom of denying medical care to incarcerated individuals housed in its facility.

376. Defendant Kinderman was personally involved in the violation of Plaintiffs' constitutional rights because, among other things, he was aware of the staff's regular practice of denying medical care and failed to take remedial action, he was aware of Plaintiffs' condition and failed to take action to remedy it, he created Oneida County's policy or custom of denying medical treatment, and he was deliberately indifferent to the medical needs of detainees in his care.

377. As a result of Defendants' unlawful conduct, Plaintiffs suffered the injuries hereinbefore alleged.

**<u>FIFTH CAUSE OF ACTION:</u>**
**Assault**
**(Against Defendants Oneida County and Albany County)**

378. All preceding and subsequent paragraphs are incorporated by reference.

379. On or about August 20, 2024, one or more of the Defendants Torrisi, Valvo, Lawson, Coppolo, Bonacci, Kelly, Haley, Ton, Legault, Pleat, Gibbons, Poulin, Jarosz, Wright, Almindo, Barlett, Livreri, Ali, Hart, and Albany County Officers A, B, G, and T (the "Albany On-Scene Defendants") intentionally placed Plaintiffs in apprehension of imminent offensive contact by threateningly approaching Plaintiffs and threatening to assault them. In addition, and/or in the alternative, one or more of the Albany On-Scene Defendants had knowledge of the assault and

provided substantial assistance by, among other things, restraining and confining Plaintiffs to permit others to assault him. Defendant Albany County is liable for their conduct under the theory of *respondeat superior*.

380.    Plaintiffs did not consent to such contact.

381.    In addition or in the alternative to their threat of unreasonable and excessive force, because the Albany On-Scene Defendants were county sheriff's deputies acting outside their county of jurisdiction, the Albany On-Scene Defendants had no lawful authority or privilege to search Plaintiffs' persons or property or use any force against them at all. Therefore, any threatened restraint or confinement of or contact with Plaintiffs, whether excessive or otherwise, was offensive.

382.    Because Plaintiffs remained in the custody of Oneida County at the time of this incident, all of the Albany On-Scene Defendants were additionally acting as agents and servants of Oneida County. Defendant Oneida County is also therefore liable for their conduct under *respondeat superior.*

383.    As a result of Defendants' unlawful conduct, Plaintiffs suffered the injuries hereinbefore alleged.

<u>**SIXTH CAUSE OF ACTION:**</u>
**Battery**
**(Against Defendants Oneida County and Albany County)**

384.    All preceding and subsequent paragraphs are incorporated by reference.

385.    On or about August 20, 2024, one or more of the Albany On-Scene Defendants committed a willful, unlawful, intentional battery against Plaintiffs by using excessive and unreasonable force against them. Defendant Albany County is liable for their conduct under the theory of *respondeat superior*.

386.     Plaintiffs did not consent to such contact.

387.     In addition or in the alternative to their use of unreasonable and excessive force, because the Albany On-Scene Defendants were county sheriff's deputies acting outside their county of jurisdiction, the Albany On-Scene Defendants had no lawful authority or privilege to search Plaintiffs' persons or property or use any force against them at all. Therefore, any and all nonconsensual restraint of or contact with Plaintiffs by the Albany On-Scene Defendants, whether excessive or otherwise, constituted a battery.

388.     Because Plaintiffs remained in the custody of Oneida County at the time of this incident, all of the Albany On-Scene Defendants were additionally acting as agents and servants of Oneida County. Defendant Oneida County is also therefore liable for their conduct under *respondeat superior.*

389.     As a result of Defendants' unlawful conduct, Mr. McNair suffered the injuries hereinbefore alleged.

### SEVENTH CAUSE OF ACTION:
**Intentional Infliction of Emotional Distress**
**(Against Defendants Oneida County and Albany County)**

390.     All preceding and subsequent paragraphs are incorporated by reference.

391.     Before, during, and after the August 20, 2024 assault on Plaintiffs, the Albany On-Scene Defendants engaged in conduct that was extreme, outrageous, and intolerable in a civilized society, including but not limited to unprovoked physical assaults while Plaintiffs were compliant and/or restrained.

392.     In engaging in such conduct, the Albany On-Scene Defendants intended or disregarded a substantial probability of causing Plaintiffs severe emotional distress. These acts were not only intentional but carried out with malice and a total disregard for Plaintiffs' known

vulnerabilities, including physical injuries, protective custody status, and/or visible psychological trauma.

393.    As a result of the Albany On-Scene Defendants' unlawful conduct, Plaintiffs suffered the injuries hereinbefore alleged, including severe emotional distress.

394.    The Albany On-Scene Defendants' conduct was so egregious and morally reprehensible that punitive damages are warranted to deter future abuse by public officials and to punish this specific instance of cruelty under color of law.

395.    Defendant Albany County is liable for their conduct under the theory of *respondeat superior*.

396.    Because Plaintiffs remained in the custody of Oneida County at the time of this incident, all of the Albany On-Scene Defendants were additionally acting as agents and servants of Oneida County. Defendant Oneida County is also therefore liable for their conduct under *respondeat superior.*

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

A.  Compensatory damages in an amount to be determined at trial;

B.  Punitive damages against all the Individual Defendants in an amount to be determined at trial;

C.  A declaration that the actions, policies, and customs of Defendants as set forth herein violated his rights under the Constitution and laws of the United States;

D.   Injunctive relief against Oneida County and Albany County, including but not limited to:

    i.    Mandates that all CERT/SERT operations at OCCF be recorded on body-worn cameras with footage preserved;

    ii.    Requirements for prompt reporting and independent review of any use of force (with disciplinary consequences for failure to report);

    iii.    Implementation of antiretaliation protocols to protect incarcerated individuals who file grievances (including transfers if needed for safety and monitoring of staff);

    iv.    Improved training for officers on the lawful use of force and on cultural/racial sensitivity to eliminate discriminatory targeting; and

    v.    A requirement that Defendants to cooperate with an independent investigation (such as by the NYS Attorney General or Justice Department) into the August 20, 2024, incident and to discipline officers found to have acted unlawfully;

E.   Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

F.   Such other and further relief as the Court deems just and proper, together with pre-judgment interest and post-judgment interest as allowed by law, and any additional equitable relief or remedial measures necessary to effectuate the rights of the Plaintiff.

Dated:  November 14, 2025
         New York, New York

                        ROTH & ROTH LLP

                        Elliot Shields
                        192 Lexington Ave., Suite 802
                        New York, NY 10016
                        (212) 425-1020

                        KAUFMAN LIEB LEBOWITZ & FRICK LLP

_____/s/_____
Douglas E. Lieb
Alyssa Isidoridy
18 E. 48th Street, Suite 802
New York, NY 10017
(212) 660-2332

*Attorneys for Plaintiff*